TOWER & SONS *v.* UNITED STATES (No. 2126).[1]

1. COMMERCIAL DESIGNATION—COMPETENCY OF WITNESS.

A witness with experience in the *manufacture* but not the *sale* of steel is not competent to prove commercial designation regarding it.

2. COMMERCIAL DESIGNATION.

If words in tariff statutes designating particular kinds or classes of goods have a well-known signification in the wholesale trade and commerce dealing therein different from the common meaning thereof, such commercial designation shall control, unless Congress has clearly manifested a contrary intention. The question of commercial meaning is one of fact, and upon the party asserting that claim falls the burden of establishing it. Commercial designation must be shown to be definite uniform, and general, and not partial, local, or personal.

3. CONSTRUCTION, PARAGRAPH 518, TARIFF ACT OF 1913—"SECONDHAND."

The term "secondhand," in paragraph 518, tariff act of 1913, means something which has been used, and does not mean something which has been received from another.

---

[1] T. D. 39080.

4. Construction, Paragraph 518, Tariff Act of 1913—"Waste"—"Scrap"—
"Refuse"—"Fit only to be Remanufactured."

The result of manufacturing processes designed to produce merchandise in the
condition it is when imported, fit, as imported, to be used for the purpose for which
it was made, does not become "waste," "scrap," or "refuse" by reason of the fact
that it is to be used as such to be remanufactured into something else. The expres-
sion "fit only to be remanufactured" is made by the paragraph to apply only to
merchandise which is secondhand, waste, or refuse.

5. Steel Bars Made for Shrapnel, But Imported for Use in Making Bolts.

Steel bars made in Canada to be used in making shrapnel shells were, owing to
the cessation of hostilities and the consequent lessened demand for such merchan-
dise, sold at greatly reduced or scrap prices and imported into the United States
to be used in the manufacture of bolts. They are dutiable as steel bars under
paragraph 110, tariff act of 1913, and not admissible free of duty as scrap under
paragraph 518.

## United States Court of Customs Appeals, March 31, 1922.

Appeal from Board of United States General Appraisers, T. D. 38789 (G. A. 8451)

[Affirmed.]

*Frank S. Anderson* for appellants.
*William W. Hoppin*, Assistant Attorney General, for the United States.

[Oral argument February 17, 1922, by Mr. Anderson and Mr. Hoppin.]

Before Smith, Barber, and Martin, Associate Judges; De Vries, Presiding Judge,
participating in the decision by agreement of counsel.

Barber, Judge, delivered the opinion of the court:
The relevant parts of duty paragraph 110 and free entry paragraph
518 of the tariff act of 1913 are as follows:

110. Steel bars * * * if made by the Bessemer, Siemens-Martin, open-hearth,
or similar processes, not containing alloys, such as nickel, cobalt, vanadium, chro-
mium, tungsten, or wolfram, molybdenum, titanium, iridium, uranium, tantalum,
boron, and similar alloys.

518. * * * wrought iron and scrap and scrap steel; but nothing shall be deemed
scrap iron or scrap steel except secondhand or waste or refuse iron or steel fit only to
be remanufactured.

It is not denied that the imported merchandise, which was in-
voiced as scrap steel or as scrap steel bars, is within the provision of
paragraph 110 if it is steel bars, and the collector classified it there-
under.

The importers contend that it is scrap steel within the meaning of
paragraph 518.

The Board of General Appraisers found, and it is not claimed here
that such findings are erroneous, the following facts with reference
to the importations:

1. As imported, the steel is in the form of bars from 5 to 16 feet in length and about
3½ inches in diameter, 80 per cent of the bars being 16 feet, 4 or 5 per cent being 8 feet,
and the balance 10, 12, and 14 feet long.

2. The steel is made in strict accordance with certain specifications which require a high carbon content, and the sole purpose or use for which it was primarily intended and designed was to be employed in the manufacture of 3½-inch shrapnel shells.

3. It was made by order of the Canadian Government at the plants of the Dominion Iron & Steel Co., in Canada, and some of it at Sydney, Australia, from whence the material was shipped to the Canadian Imperial Munitions Board and by the latter placed in storage before the armistice was signed.

4. After the signing of the armistice, the board found itself possessed of very large quantities of war material, and this steel, together with other surplus stocks, was disposed of by the Imperial Munitions Board to purchasers at greatly reduced prices, the purchaser of this particular shipment being Drucks & Frost (Ltd.), of Toronto, Canada.

5. The latter firm in turn sold the steel to the Buffalo Bolt Co., of Buffalo, N. Y., who manufactured the material into bolts.

6. In the interim, and until the steel was so manufactured into bolts, the original form and condition thereof remained intact and the material was not in the least respect altered or changed, nor was any manufacturing or other process applied thereto.

It also appeared that these pieces of steel had fractured ends, which fact importers claim tends to show that they were not commercial steel bars.

The importers at the hearing before the board introduced certain testimony from which it is claimed that this steel was not steel bars within the contemplation of paragraph 110 in that the term as there used had a commercial meaning, which would exclude it from that classification, and rely upon the well-known rule that if words in tariff statutes designating particular kinds or classes of goods have a well-known signification in the wholesale trade and commerce dealing therein different from the common meaning thereof, such commercial designation shall control, unless Congress has clearly manifested a contrary intention.

The board found against the importers on that issue. It is urged here that this finding was clearly contrary to the weight of evidence. We have carefully examined the record in this regard and find ourselves unable to sustain this contention of importers.

The question of commercial meaning is one of fact, and upon the party asserting that claim falls the burden of establishing it.

The single witness, Mr. Waterhouse, upon whose testimony importers chiefly rely for this purpose, testified in substance that he was employed by the Lackawanna Steel Co. as its metallurgical inspecting engineer and had supervision of making all its steel; that the company did not purchase any steel; that he was not in its sales department, although he knew about the orders given to his company, and if any question of the quality of the material came up, saw and conferred with the buyers thereof; that he passed upon the orders as to whether they would be profitable to his company; that he had become familiar with the terms used in the steel trade; that the expression "steel bars" had a general well-known meaning therein in October, 1913, which meaning he said would exclude the

merchandise in this case, although he said he had not himself bought and sold steel under the commercial designations of the trade, and that his experience had been confined to making material for sale. He said he would call the merchandise scrap, "because of its random length, very bad appearance," and that "commercial bars are sheared with a regular end that is produced by sawing the bars." He also testified that the Lackawanna Steel Co. had acquired merchandise similar to the importation here which it did not use in the condition imported, but had it broken up and sent to the furnace for remelting.

Among other things, he testified on cross-examination that steel bars of such varying lengths as the merchandise here, with similar fractured ends, might be commercial steel bars.

While doubtless this witness was expert in the manufacture of steel, we do not think the record shows that he possessed the requisite knowledge of wholesale commercial transactions in the steel trade to speak with authority upon the question of commercial designation, and in any event we do not think the finding of the board that the claimed commercial meaning had not been established should be reversed by us upon the ground that it is contrary to the weight of evidence.

In this connection it must be remembered that commercial designation must be shown to be definite, uniform, and general, and not partial, local, or personal.

As confirming the board's finding on this issue, we note that another witness, the superintendent of the Buffalo Bolt Co., testified that in manufacturing the bars into bolts they sheared them to length, heated and rolled them into bolt stock; that they were in the form of steel bars when received; that steel articles of that size would generally be known in the trade as steel bars; and that they so remained up to the time they were converted into bolts. He was not specifically offered as a witness on commercial designation, and part of the testimony we refer to was given on cross-examination.

The importers urge that if the importation was ever steel bars, nevertheless, by reason of the fact that at the time of its entry there was no demand for it for the purpose of manufacturing shells, and it became necessary, in order to dispose thereof, to sell it at what was termed "scrap prices," coupled with the fact that it was used in the manufacture of bolts, establishes the claim that it was scrap steel within paragraph 518. Again we are forced to disagree with importers' contention. That paragraph described what shall be deemed scrap or scrap steel by declaring that nothing shall be so regarded "except secondhand or waste or refuse * * * steel fit only to be remanufactured."

We think the term "secondhand" is commonly applied to something that has been used to some extent, generally for a purpose for which it was considered adapted. Importers contend that the meaning sometimes applied thereto as "received from another" is applicable here. Such a meaning of the term might transform a perfectly new article that had not deteriorated in any respect, and which was usable, and for which there was a demand, into the condition of scrap simply because it had changed hands after its production and before its importation. We do not think it could be well said, for illustration, that an automobile which had never been used, was perfect in all its parts and ready for use, became a secondhand automobile simply because its ownership had changed two or three times before it went into use.

Nor do we think these steel bars are waste or refuse fit only for remanufacture within the meaning of paragraph 518. They are the result of manufacturing processes designed to produce them in their imported condition, not waste or refuse resulting from those processes. As imported they are ready to be used in the manufacture of shells. They have been used in the manufacture of bolts, and so far as this record is concerned appear to be reasonably adaptable thereto. They are not scrap as that term is commonly understood. Whether they are fit only to be remanufactured becomes somewhat unimportant, unless they are first found to be second-hand or waste, but if that condition had been established, we are of opinion that the record here fails to show that the bars in question are fit only for remanufacture.

The importers finally contend that having regard to the fact, of which we are asked to take judicial cognizance, that owing to the cessation of war the demand for material of this kind has largely ceased, we should hold these bars to be in fact scrap or junk, while at the same time they admit that they are entirely suitable for the purpose for which they were designed.

Much as we would like to be able to assume that the time has arrived in the history of the world when there will be no war that would permit or require the use of shells in the conduct thereof, and, therefore, that there would never be demand for steel bars similar to these for the purpose of manufacturing shells therefrom, we hesitate to decide this case in favor of importers upon that ground, nor is it clear that because the original purpose for which these steel bars were made can not be carried into execution they could now be regarded in any aspect as scrap or junk, in view of the fact that they are readily diverted into the manufacture of bolts, to which use, so far as the record in this case shows, they are commercially adaptable.

The demand for many products has largely fallen off because of the end of the great war. Large losses have undoubtedly been sus-

tained by reason thereof, just as large profits undoubtedly accrued theretofore. The cessation of demand, however, can not necessarily convert a given product into scrap. A diminished demand for a given commodity may occur in times of peace, and the failure of demand for a product is always a contingency that confronts a producer thereof.

We think the importers have failed to sustain the burden cast upon them in this case by showing not only that the classification of the collector is erroneous, but that the one claimed by them is correct.

The judgment of the Board of General Appraisers is *affirmed*.