(C. D. 1110)

OLAVARRIA & CO., INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided May 28, 1948)

*Baer & Marks* (*Donald Marks* and *Edward P. Sharretts* of counsel) for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Dorothy C. Bennett*, special attorney), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

EKWALL, Judge: In this case plaintiff is protesting the action of the collector of customs at the port of Tampa, Fla., in assessing duty upon

a quantity of what plaintiff claims to be sugar sirup imported from Cuba. Twenty-seven entries are involved, filed at the ports of Miami and West Palm Beach during a period from August 4, 1943, to August 1, 1944. Five protests were consolidated for trial. The merchandise was classified as sugar dutiable under the provisions of paragraph 501 of the Tariff Act of 1930, as modified by the supplemental trade agreement with Cuba (T. D. 50541), by virtue of the mixed-material clause in paragraph 1559 of said act. This assessment was based on a finding that the importations consisted of nonenumerated manufactures in chief value of sugars. Duty was assessed at the maximum rate applicable to products of Cuba, viz, $0.0051375 per pound.

In addition to the duties assessed under the tariff act, there was imposed a tax under section 3500 of the Internal Revenue Code (Title 26, U. S. C., 1940 ed., section 3500)—previously enacted as section 3500, Int. Rev. Code, 1939, 53 Stat. 428; and section 403 (a) and (b), Sugar Act of September 1, 1937 (50 Stat. 913).

It is claimed on the part of the plaintiff that the products should be classified under paragraph 502 of the said tariff act, as modified by the supplemental trade agreement with Cuba, at the rate of duty therein provided for sugar sirups testing above 48 per centum total sugars. In addition to this claim, protest 118038–K claims a 20 per centum reduction in the tax assessed under the Internal Revenue Code, by virtue of the provision allowing a 20 per centum preferential reduction to products of Cuba in section 2 of the Cuban Reciprocity Treaty of 1902 (T. D. 24836), and the Cuban Trade Agreement of 1934 (49 Stat. 3559) (T. D. 47232). The latter claim was raised by amendment to the remaining protests, with the exception of protest 112454–K. The Government objected to the proposed amendments on the ground that they plead a different statute from that involved in the original protests and constitute a new cause of action. Ruling on the motions to amend was reserved at the hearing.

The leading case in which the question of amendments of protests is discussed and the rule in regard thereto is stated, is *United States* v. *Macksoud*, 25 C. C. P. A. (Customs) 44, T. D. 49041. There, the court held in substance that amendments were permissible which presented new and additional claims which might have been made in the original protest as to the merchandise covered by that protest. In arriving at that decision the court cited and discussed the earlier case of *Agfa Ansco Corp.* v. *United States*, 66 Treas. Dec. 169, T. D. 47217, where it was held that a protest, the claim in which was limited to the Revenue Act of 1932, might, under section 518 of the Tariff Act of 1930, be amended so as to set forth a claim against the collector's assessment of duty under the Tariff Act of 1930. The converse of that

situation confronts us here, i. e., the original protest claimed under the Tariff Act of 1930, as modified, and the amendment sought claims under the Internal Revenue Code. Under authority of the cited cases, we find that the amendments, having been duly filed, are permissible and the same are hereby granted.

We then proceed to the questions presented on the merits, which are summarized by the Government in its able brief as:

(1) Does the presence of the artificial flavoring in the instant importations remove them from the term "sugar syrups" in Par. 502 of the Tariff Act of 1930?

(2) Do the provisions of the Cuban Reciprocal Treaty of 1902, or the Cuban Trade Agreement of 1934 (as amended by supplemental Agreements of 1939 and 1942) provide for a 20% preferential reduction in taxes assessable on importations of Cuban products under the Internal Revenue Code?

It is noted at the outset that as to protest 113232–K, 89 barrels of unflavored sirup on entry W–382 were assessed under paragraph 502, *supra*. Plaintiff makes no claim as to that merchandise.

## The Regular Duties

The provisions of the Tariff Act of 1930 applicable to sugar and sugar sirups, as modified by the supplemental Cuban Trade Agreement, are as follows:

Par. 501 [As modified by second supplemental Cuban Trade Agreement, T. D. 50541, effective January 5, 1942]:

### ARTICLE II

\*          \*          \*          \*          \*          \*          \*

2. The note following item 501 of Schedule II of the Agreement of August 24, 1934, as amended, is hereby terminated, and item 501 of the said Schedule is amended to read as follows:

| Tariff Act of 1930; paragraph | Description of articles | Column 1 Minimum preferential reduction to Cuba | Column 2 Maximum rates of duty. Specific rates in United States dollars |
|---|---|---|---|
| 501 | Sugars, tank bottoms, sirups of cane juice, melada, concentrated melada, concrete and concentrated molasses, testing by the polariscope not above 75 sugar degrees, and all mixtures containing sugar and water, testing by the polariscope above 50 sugar degrees and not above 75 sugar degrees. | 20% | 0.0051375 per lb. |
| | and for each additional sugar degree shown by the polariscopic test. | 20% | 0.0001125 per lb. additional, and fractions of a degree in proportion. |

Par. 502 [As modified by supplemental Cuban Trade Agreement, T. D. 50541, effective January 5, 1942]:

## ARTICLE II

1. The following additional items are inserted in Schedule II of the Agreement of August 24, 1934, as amended, in the proper numerical order:

| Tariff Act of 1930; paragraph | Description of articles | Column 1 Minimum preferential reduction to Cuba | Column 2 Maximum rates of duty. Specific rates in United States dollars |
|---|---|---|---|
| | *      *      * | * | * |
| 502 | Molasses and sugar sirups, not specially provided for: | | |
| | Testing not above 48 per centum total sugars | 20% | 0.001 per gal. |
| | Testing above 48 per centum total sugars____ | 20% | 0.0011 additional for each per centum of total sugars and fractions of a per centum in proportion. |
| | NOTE: No molasses and sugar sirups within the purview of this item shall be included in any tariff quota provided for in any trade agreement heretofore or hereafter entered into under section 350 of the Tariff Act of 1930, as amended, with any country other than Cuba. | | |

Paragraph 1559 of the same law reads as follows:

PAR. 1559. That each and every imported article, not enumerated in this Act, which is similar, either in material, quality, texture, or the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty which is levied on the enumerated article which it most resembles in any of the particulars before mentioned; and if any non-enumerated article equally resembles two or more enumerated articles on which different rates of duty are chargeable, there shall be levied on such nonenumerated article the same rate of duty as is chargeable on the article which it resembles paying the highest rate of duty; and on articles not enumerated, manufactured of two or more materials, the duty shall be assessed at the highest rate at which the same would be chargeable if composed wholly of the component material thereof of chief value; and the words "component material of chief value," wherever used in this Act, shall be held to mean that component material which shall exceed in value any other single component material of the article; and the value of each component material shall be determined by the ascertained value of such material in its condition as found in the article. If two or more rates of duty shall be applicable to any imported article, it shall be subject to duty at the highest of such rates.

Taking up the first question presented, viz—Are the importations sugar sirups provided for in paragraph 502, *supra*?—we will examine the record as presented.

The Government does not deny that sugar sirups of similar characteristics, minus flavoring, should be and have been classified under said paragraph 502.

Five witnesses were introduced on behalf of the plaintiff and nine on behalf of the Government. Two illustrative samples of the merchandise, exhibits A and B, and 31 laboratory reports showing results of analyses of the official samples from these importations, were introduced in evidence. These analyses disclose that the importations contain 27 per centum to 68 per centum sucrose by weight, 15.5 per centum to 47 per centum invert sugars, 68.5 per centum to 77 per

centum total sugars, and that (with two exceptions) they test by the polariscope below 50 degrees and all contain flavoring, either vanilla, mapleine, or maple. Four documentary exhibits, Nos. 1, 2, 3, and 5 were also produced in evidence. Exhibit 1 is a handbook by Spencer, a recognized authority on the chemistry and manufacture of sugar.

At this point, for purposes of clarity, we set forth certain definitions of terms relating to sugar sirups and the tests thereof as follows, as derived from the testimony and exhibits:

Sucrose           The chemical name for the crystalline product extracted from the juice of the sugarcane. Sucrose has the chemical formula $C_{12}H_{22}O_{11}$, and has the characteristic of rotating a polarized beam of light to the right.

Invert Sugar           Invert or reducing sugar is made by converting sucrose into levulose or dextrose by a hydrolyzation process; the chemical formula for invert sugar is $C_6H_{12}O_6$ which is the formula for both dextrose and levulose. A catalyst such as hydrochloric acid, phosphoric acid, or other reducing agent will cause the combination of a molecule of sucrose with a molecule of water to form one molecule of levulose and one molecule of dextrose. Raw crystalline sugar is 99% sucrose; and molasses is concentrated invert sugar. Invert sugar will not crystallize. It has the same sweetness as sucrose.

Sirup           A sugar sirup by commercial standards must be a concentrated solution of sugar and water. In a sucrose sirup, maximum concentration is approximately 67%; in an invert sirup maximum practical concentration is about 78% to 80%.

Polariscopic Test           The polariscope is an instrument to measure the rotation of polarized light when passed through a solution. Sucrose in solution rotates light to the right giving a plus polariscopic reading; and the polariscopic scale is based upon a reading of plus 100° for a pure sucrose solution. Impurities in sucrose will lower the polariscopic reading. Invert sugar has the characteristic of rotating light to the left and a completely inverted sirup has a polariscopic reading of about minus 30°. This figure of minus 30° results from the component value of levulose which has a polariscopic value of minus 140° and dextrose which has a polariscopic value of plus 80°, the two together in a completely inverted solution resulting in a net of minus 30°. A mixture of sucrose and invert sugars in a sirup containing approximtely 38% sucrose and 39% invert sugars would have a polariscopic test of about plus 25°.

The polariscopic reading is of significance to indicate the amount of sugar in solution only if one starts with a sucrose solution. If the solution is an ordinary invert sirup, the polariscopic reading by itself gives no indication of the total sugar content because it is affected by the relative proportions of sucrose and reducing sugars. Because of the use of the polariscopic test in paragraph 501, the reading becomes important in determining whether sugar in solution under certain circumstances is dutiable under paragraph 501 or whether under other circumstances it is dutiable under paragraph 502. If a maximum concentration of sugar in

solution is present and hence a commercially designated sirup, if the polariscopic reading is over 50°, it automatically is dutiable under paragraph 501 as a sucrose sirup; if, on the other hand, the polariscopic reading of such a sirup is below 50°, it is not commercially usable for its sucrose content and therefore as a sugar sirup is excluded from paragraph 501 and falls within the terms of paragraph 502.

Total Sugars     There are several tests relating to the determination of total sugars in liquid form.

The Clerget test determines, by means of the polariscope, total sucrose content. The Brix test determines total solids.

The Baume test is the ordinary commercial test of density of solutions, and therefore is commonly used to express the total sucrose and reducing sugar content of a sugar solution. It is expressed as an arbitrary scale in degrees, such as 42° Baume, which would represent 76% of total sugars.

From the evidence the following appears. The merchandise before us was produced in Cuba. It was imported by the plaintiff and sold entirely to manufacturers and processors of fountain sirups, bakery products, soft drinks, ice cream, cordials, candy, pharmaceuticals, and other food products. It is sold in bulk and not under any brand name or label.

The method of extracting sugar from cane was described by one of the plaintiff's witnesses, a sugar chemist and engineer, as follows: The cane is cut and brought to the mill where it is crushed, the juice is collected and purified by addition of lime, heating, etc., after which, when it is clarified sufficiently, it is evaporated, which results in melada or concentrated sugar solution. The next step is to place the concentrated sugar solution in vacuum pans where it is boiled to a certain density, after which it is centrifuged in order to separate the crystalline sugar from the residue. The crystallized raw sugar is then sent to refiners for further refining processing. The liquid obtained from the crushing of the sugarcane is known as cane juice. After the processes of clarification and evaporation it is known as melada. The boiling in vacuum pans results in a mixture of sugar crystals and water known as massecuities. When this mixture is put through the centrifugals, the sugar crystals are separated from the molasses. These sugar crystals constitute raw sugar. Molasses is a byproduct of raw sugar.

The commodity before us is described as a partially inverted sugar sirup to which some flavoring has been added. It is made by melting down raw sugar, subjecting it to further filtration and refining treatment, after which the clarified sirup is partially inverted to prevent further crystallization. In its final form the sirup is a colorless or pale amber liquid which, in this case, contained a maximum concentration of sucrose and reducing sugars in combination. The inverting agent, which may be hydrochloric acid or some similar catalyst, is neutralized when the inversion process has reached the required point.

Taking up the testimony in detail we find as follows:

Plaintiff's principal witness, Mr. Lobo, vice president of the importing firm, testified that he has been in the sugar business since 1929. In 1943, due to war conditions, the demand for sweetening was increased to such an extent, because of the shortage of sugar, that it became profitable to pay the higher transportation rates required to transport sirups from Cuba to the United States, due to the inability of American manufacturers to obtain sufficient dry sugar for their purposes. Prior to May 1, 1944, the O. P. A. sugar regulations did not require flavored sugar sirups to be rationed, but by amendment of the O. P. A. regulations, on and after that date such products were subject to ration evidence if they were to be used in the manufacture of other articles or for further processing. Therefore, after May 1, 1944, plaintiff no longer imported these flavored sirups.

The instant commodity was made by various sugar refineries in Cuba, in accordance with specifications prepared by this witness, which specifications required a consistency of sucrose, partly inverted, water, and flavoring. The witness testified that his specifications called for a partially inverted sirup containing about 38 per centum sucrose and about 39 per centum reducing sugars, total sugars to be about 77 per centum, and a weight of 9 pounds of sugar to the gallon of sirup. To each gallon of this sirup was added one-sixteenth of an ounce of concentrated extract of vanillin, or some other flavor such as white pine tar compound, mapleine, grape extract, or Cola extract. Plaintiff's customers used these flavored sirups for the purpose of sweetening their products. One, National Biscuit Co., used it for making fillings for its crackers; Canada Dry Co. did not use it for ginger ale, but did use it for Spur and bottled soda. The specifications were changed in some instances to meet the desires of particular customers.

Some of plaintiff's imported sirups were flavored only with phosphoric acid "for the manufacture of certain products for which the vanilla taste was not suitable." In those cases the invert agent used had been hydrochloric acid, the same as in the others, and phosphoric acid was added as a flavoring, producing a tart taste like citric acid, used for making orange drinks, lemon soda, etc. When sold to the fountain trade, the flavoring materials were furnished by the plaintiff and in most instances one-sixteenth of an ounce of concentrated extract of vanillin per gallon of sirup was used.

The merchandise is a partially inverted sugar sirup to which flavoring has been added. In its form as imported it contains a maximum concentration of sucrose and reducing sugars in combination. The reducing agent, which may be hydrochloric acid or some similar catalyst, is neutralized when the inversion process has reached the required point.

On the question of the name by which this sirup was generally bought and sold.in the trade of this country during 1943 and 1944, the witness Lobo stated that it was "flavored sugar sirup." When he bought and sold these flavored sirups in the United States, he always qualified the product by the name of the flavoring present. -

Plaintiff's second witness, Mr. Baikow, is a chemist in charge of a commercial laboratory where he analyzed certain samples of flavored sirups for this importer. He testified as to the various operations required for the manufacture of cane sugar and the methods of ascertaining the sucrose and invert sugar content of sugar solutions generally. He had visited sugar refineries in Cuba but had not been there since 1936. He stated that, so far as general principles are concerned "There is only one method to manufacture sugar." His testimony was general in nature.

Mr. Grissler, a sugar broker since 1928, testified also on behalf of the plaintiff. Prior to 1928, he was a salesman for the American Sugar Refining Co. for 12 years. He testified that starting in 1924 or 1925, he sold sirups for that company to industrial users, such as ice-cream manufacturers, fountain sirup manufacturers, and some bakers; that the manufacturers of ice cream used it for sweetening purposes and the fountain sirup manufacturers as an "ingredient"; that he sold a sirup containing probably 4 per centum to 8 per centum invert sugars and also one that was all sucrose. However, he did not know the technically accurate percentages of either. He testified further that during the period 1924 to 1928 he sold all of the above-mentioned products as "sugar sirup" without regard to whether they contained invert sugars or not; that none of those sirups contained acid or were flavored in any manner, the manufacturer having guaranteed them to be acid free.

While a sugar broker since 1928, he had also sold sugar and sirups for National Sugar Refining Co., the Nulomoline Co., American Sugar Refining Co., and Olavarria & Co.; the Nulomoline Co. specializes in invert sirups; and he had sold such sirups to the same class of trade as mentioned above. He stated that these were sold under trade names in a great many instances. He stated that where they are not sold under a trade name they are sold as sugar sirup (referring to the unflavored product), and that all the sirups he had discussed, other than the plaintiff's, were unflavored; that the sirups he sold under proprietary names were sold as "invert sugars"; that "liquid sugar" is also a term he knows in the trade as referring to sugar sirup which could be partly invert sugars but not necessarily. Referring to the unflavored product, he stated that while "some refiners call it liquid sugar and others call it sugar sirup," he offers and sells it by either term.

The Government introduced into evidence the testimony of Mr. Wadsworth, vice president in charge of sales for Refined Sugars & Syrups, Inc., since 1925. He testified that said company is the largest producer of "liquid sugar" in the United States, having been in the business since 1925, and that "Liquid sugar is an over-all term to cover sugar sirup and invert sugar sirup."

He stated that invert sirups are not commonly known as sugar sirups to technicians in the business and added: "I think they would say that sugar sirups would have a meaning of more or less a sucrose product," but he admitted that the public generally makes no distinction between sucrose and invert when they use the term "sugar sirup."

The Government also introduced the testimony of Mr. Wills, who had had 36 years' experience in the sugar business and is now supervisor of refining for the American Sugar Refining Co., which is the largest sugar refinery in this country and is also engaged in producing sirup products. He stated that his firm makes byproduct molasses sirups and also "liquid sugars"; that the term "liquid sugars" refers to any noncrystalline product derived from sugarcane or sugar beets containing not more than 6 per centum of nonsugar solids, as defined in the Sugar Act of 1937; and that his firm makes a sirup containing approximately 42 per centum sucrose and 31 per centum invert sugar, which he includes in his designation "liquid sugars." He testified his firm also makes a sirup containing 67 per centum sucrose and one-tenth of 1 per centum invert sugar, which is designated as "No. 1 sugar syrup." This has no flavoring.

Based upon his experience in the industry, this witness testified that the term "sugar sirup" has no definite, uniform meaning in relation to any particular product and when it is used at all in the industry it is in connection with all saturated solutions of sugar, such as this firm's No. 1 sugar sirup, which is a saturated sucrose solution, not an invert sirup. He stated there is a range in the trade for invert sirups from about 72 per centum to 80 per centum total sugars, the balance water and some negligible nonsugar solids, which product is frequently spoken of as "invert sugar sirup."

It was the testimony of this witness, based upon his 20 years' experience in making and selling sirups, and his previous experience in the molasses business, that the term "sugar sirup" has no specific meaning in the trade in this country with respect to any particular product; that the same is true of the term "liquid sugar," although his firm uses the latter term more frequently.

He stated that there is no flavoring other than the natural sugar sweetness in his firm's products and based upon his experience, a sirup like that produced by his firm, but with added vanilla flavoring, is not a product known in the trade in this country as a sugar sirup.

This witness on cross-examination stated that "sugar sirup" is a term commonly known in the sugar industry, and that "liquid sugar" is a general term including both sucrose sirups and invert sirups; that in commercial practice a sugar sirup should be more than a concentrated solution, rather a saturated solution; that the tariff term in paragraph 501, i. e., "mixtures containing sugar and water testing by the polariscope above 50 sugar degrees" has no trade significance, but would cover a saturated solution of pure sucrose.

This witness admitted that sugar sirup is properly classifiable under paragraph 502 if it is not suitable for refining, and that where the amount of inversion is sufficient to bring the polariscopic reading below 50 degrees, the invert sugar cannot be crystallized out and the sirup is not commercially usable by refiners for extracting sugar. When interrogated as to whether he would include in the class of sugar sirups a mixture of sugar and water and flavoring matter such as vanilla, whether the sugar was sucrose or invert, he answered "I would not." He explained that this answer was due to the inclusion of the flavoring in the product.

The technical sales representative for the American Sugar Refining Co. appeared as a witness on behalf of the Government. He testified that he had been in the sugar business 30 years; that he is familiar with the various grades of sirups described by the witness Wills, and their sale in this country on the east coast and as far west as the Mississippi River; that the sales of sirup are limited largely to the cities of Boston, New York, and Philadelphia; that the term "sugar sirups" has no definite, uniform meaning in the trade unless used with a prefix, such as No. 1 sirup, invert sugar sirup, or sugarcane sirup, or some designation indicating the nature of the sirup. He stated:

When I speak of sugar sirup I refer to what is known in the United States Pharmacopoeia as simple sirup, which is a solution of sucrose or cane sugar or beet sugar, whichever name you want to use, and water. It is also known in the trade and also recognized to include standard—the word "sugar sirup" being interchangeable with "sucrose," the word "sucrose" having no meaning to the commercial manufacturer, "sugar" is used by the commercial manufacturer, "sucrose" by the technician.

In answer to the question as to whether the term "liquid sugar" has a definite, uniform meaning in the trade, this witness stated that the term is used in contradistinction to solid sugar, usually when the term "liquid sugar" is an "all-inclusive term, and means sugar or inverted sugar, which is dextrose and levulose in equal proportions, dissolved in water." He testified further that the products of the American Sugar Refining Co. are generally sold as a special type of sugar sirup, with a prefix designating what type of sirup it is; and that "The general over-all picture of sugar sirups * * * might be applied to the whole field of sirups in which there was a predominant quantity of sucrose or sugar."

On cross-examination this witness admitted that the Pharma-
copoeia definition of sirup is a simple sirup, which is a saturated sugar
solution in terms of the layman, and in terms of the chemist, it is a
sucrose; that the general use of the term "sugar" in the industry is
applied to the solid form, that is, sucrose, which is refined sugar
polarizing more than 99.9 degrees; that the word "sugars" has prac-
tically no meaning to the trade. In referring to the term "sugars"
in the plural, he testified that in the trade generally it denotes different
purifications, different qualities of purity, and different varieties in
the classification of sugar.

The Government witness, Mr. Stueber, who has been in the sugar
business for 26 years and is now chief chemist for the Long Island
plant of the National Sugar Refining Co., testified that to him the
term "sugar sirups" "wouldn't have any definite meaning" and
"might mean many things," but that he did not feel qualified to
testify as to the general trade understanding.

The Government also produced as a witness, Mr. Helsher, a sales-
man with the National Sugar Refining Co., having been connected
with that concern 27 years. For the past year his duties have been
in connection with the sales of the products of his company. Said
company has consignment points as far west as Chicago, St. Louis,
Minneapolis, and east of those cities, for the Krist-O-Kleer products,
with which he is familiar, which consist of invert sugar solutions. He
has nothing to do with the sale of sugar liquors. In his experience
the term "sugar sirups" has no definite, uniform meaning in the trade.

Mr. Friedman, the next Government witness, the general manager
of a company manufacturing sirups, which has been in the business
more than 30 years, doing a large volume of business, stated that the
sales territory of that company was New York City and vicinity;
that they make flavored sirups from refined sugar, water, and flavoring.
They buy part of the sugar and water solution used by them from
refiners and sell the imitation vanilla-flavored sirup to fountain-sirup
users, soda fountains, luncheonettes, etc. The name used in the
offers and sale of these products is fountain sirups, qualified by the
name of the flavoring. The vanilla sirup tests by the Baumé method
approximately 31 sugar degrees. Their sirups are cut down in density
of the sugar to 6 pounds per gallon. The fountain sirups made by his
company can be made from invert sugar sirups as well as sucrose
sirups. So far as the trade is concerned, the terms "liquid sugar"
and "sugar sirup" are synonymous. This company purchased some
of the vanilla-flavored sirups that the plaintiff herein was selling in
1943 and 1944, and a representative of the company obtained the
specifications of the sirups from Mr. Lobo, plaintiff's witness herein.
His company was not able to use the sirups as their fountain sirups
by merely adding water, but had to increase the vanillin content to

agree with their formulas. This witness also stated that the amount of flavoring in these sirups was negligible in some cases, and that the quantity of the potency of the flavoring fluctuated to some extent.

The next witness on behalf of the Government, Mr. Kuperschmid, who has been connected with a sirup-manufacturing firm since 1927 and was at the time of the hearing general manager, testified that his sales territory was metropolitan New York, New Jersey, and the eastern coast of the United States. His company uses as the basic ingredients in their sirups refined sugar, water, corn sirup, and flavoring; and they also buy some sugar and water solutions from refiners. They use imitation vanilla flavoring and natural sirups of strawberry and raspberry. The total sugar content of their vanilla-flavored sirup is 30 to 31 degrees Baumé, which is about 6 pounds of sugar per gallon. This vanilla-flavored sirup is sold as imitation of vanilla-fountain sirup. As to the sirups they buy from others, they are all described by the sellers as sirups and are sucrose sirups designated by numbers. They also buy invert sirups of about 41 degrees Baumé. Less labor is required in using the sucrose sirup because the mixing is simpler than when invert sirups are used, but in other respects, as far as the material itself is concerned, there is no difference.

Mr. Lefkowitz, the president of two concerns which manufacture and sell fountain sirups, with a sales territory in the metropolitan area and an approximate annual volume of business of about half a million dollars, testified on behalf of the Government. His firms manufacture and sell a vanilla-flavored sirup, the basic ingredients of which are water, sugar, and flavoring. Their sales are made to the same class of customers as those enumerated by the previous witnesses, and in making their offers for sale, they qualify the commodity with the name of the flavoring, never offer it simply as sugar sirup. Their vanilla-flavored sirup contains 6.7 pounds of sugar solids per gallon and shows 34 degrees by the Baumé test. On cross-examination the witness stated that their artificial vanilla-flavored sirups contain about an ounce of flavoring to 50 gallons of the finished product. His firms buy vanilla-flavored sirups from Olavarria & Co., Inc., the plaintiff herein, to which they add water and extra vanilla flavoring. They also purchased invert sirups from the American Sugar Refining Co. and Nulomoline Co. for a number of years. These invert sirups are known as sugar sirup, and range from 75.8 Brix to 76 Brix, being highly concentrated solutions, 76 Brix being a saturated solution and equivalent to around 40 degrees Baumé. Speaking from the standpoint of trade practice, he stated that most fountain sirup manufacturers add other ingredients besides water and flavoring to the invert sugar sirups that they buy as a base for their fountain sirups. His own firms do not add any other ingredients except extra flavor to the vanilla-flavored sirups they

buy from Olavarria & Co., Inc., because of the additional water, but with other sirups they do add other ingredients.

The plaintiff's witness, Mr. Lobo, called on rebuttal, stated that the plaintiff sold sirup to makers of cereals; the Borden Co.; National Dairy Co., manufacturers of ice cream; the Pet Milk Co., manufacturers of condensed milk; National Biscuit Co. and United Biscuit Co., manufacturers of crackers; the Kuyper Co., manufacturers of cordials; and a great many others, including some candy manufacturers. As to the use of this sirup by their customers, this witness stated that it was used in the making of ice cream, in the sweet fillings for crackers, and in the making of soft drinks, with the exception of ginger ale.

This witness stated that he knew of no instance in which the sirup in question was ever sold direct to consumers, other than manufacturers and processors, in the form in which it was imported.

The above testimony falls far short of establishing commercial designation in that it fails to show that the term in question has a definite, uniform, and general meaning in the trade and commerce of the United States. The rule is well-established that commercial designation is a fact to be proved. *Maddock* v. *Magone*, 152 U. S. 368; *American Bead Co.* v. *United States*, 7 Ct. Cust. Appls. 161, 164, T. D. 36465. The cases further hold that it is the result of established commercial usage which must be shown to be definite, uniform, and general throughout the United States, not partial, local, or personal. *Maddock* v. *Magone, supra; Berbecker* v. *Robertson*, 152 U. S. 373, 376; *United States* v. *Kwong Yuen Shing*, 1 Ct. Cust. Appls. 14, T. D. 30773; *United States* v. *Georgia Pulp and Paper Manufacturing Co.*, 3 Ct. Cust. Appls. 410, T. D. 32998; *Tower* v. *United States*, 11 Ct. Cust. Appls. 261, T. D. 39080; *Jas. Akeroyd & Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 440, T. D. 42641; and *United States* v. *Brandenstein*, 17 C. C. P. A. (Customs) 480, T. D. 43941.

In the absence of satisfactory proof of commercial designation, we must construe the term "sugar sirups" in the light of the intent of Congress considered in connection with its ordinary meaning.

In arriving at the Congressional intent we have had recourse to the Summary of Tariff Information, 1929, where at pages 985 and 996, respectively, we find the following:

Cane sirup is a direct product of cane juice, retaining in the finished product practically all of the sugar contained in the juice, but freed from some impurities and boiled to the required density. Sirups of cane juice are usually edible and if testing not above 50° of sugar by the polariscope carry the same rate of duty as edible molasses; if above 50° of sugar by the polariscope they belong in paragraph 501.

   *       *       *       *       *       *       *

The words "molasses" and "sirup" standing by themselves as commonly understood and when used to designate the table product derived from sugar cane have

been held to mean the thick concentrated or condensed liquor or fluid drained off the sugar or crystallized sugar in the making of sugar. That Congress used those terms in their ordinary sense in paragraph 502 was held by the Court of Customs Appeals to be evidenced by the fact that molasses and sirups are therein made dutiable by the gallon and not by the pound or dry measure. A gallon in the United States was held to be a liquid and not a dry measure. For customs purposes the gallon recognized by the Congress and the Treasury Department is the wine gallon of 231 cubic inches. (14 Ct. Cust. Appls., 78, T. D. 43024.) * * *

In this connection the decision of this court in the case of *Savannah Sugar Refining Corp.* v. *United States*, 61 Treas. Dec. 401, T. D. 45477, affirmed in *Savannah Sugar Refining Corp.* v. *United States*, 20 C. C. P. A. (Customs) 272, T. D. 46061, is helpful in its analysis of the background of the two paragraphs here involved. There the commodity under consideration consisted of a mixture of raw sugar and water, to which had been added a formaldehyde mixture as a preservative. The chemical analysis made by the Government chemist showed:

| | |
|---|---|
| Polarization | 45.50 sugar degrees |
| Specific gravity | 1.21863 |
| Brix | 47.6 |
| Sucrose | 45.54 percent |
| Reducing sugars | .42 percent |
| Total sugars | 45.96 percent |

Assessment had been made under paragraph 501 as sugar testing by the polariscope not above 75 sugar degrees. It was claimed on behalf of the importer that the commodity should be classified under paragraph 502 as "sugar sirups, not specially provided for," either directly or by similitude under paragraph 1559, or under paragraph 1558 as an unenumerated manufactured article. This court there stated that Congress must have used the term "sugar sirups" in paragraph 502 in the common meaning of that term, citing dictionary definitions and Department of Agriculture rulings to show that the term means "a saturated solution of sugar in water." The case of *Cresca* v. *United States*, 15 Ct. Cust. Appls. 105, 106, T. D. 42185, was cited as having adopted that definition. The trial court stated:

* * * Here, then, is the test: The sugar content of a solution determines whether it is or is not a sirup.

\* \* \* \* \* \* \*

Congress legislated in full knowledge of this understanding of what is meant by the term "sugar sirup," and we must presume that it intended to use the term "sugar sirups" in the sense in which they had been defined in the judgments of the court of appeals above cited. [Citing cases.]

The trial court arrived at the conclusion that inasmuch as the product there involved was not a saturated solution of sugar and water, and was not an article of trade known commercially in the United States, it was not a sugar sirup as that term is used in paragraph 502. It was further held that the similitude doctrine had no application for the reason that similitude of use had not been proven and that the

element of use has always been considered a major consideration in establishing similitude. The Court of Customs and Patents Appeals affirmed the finding of the trial court and, after noting the definitions of the word "sirup" in numerous dictionaries and in the Department of Agriculture rulings, stated that term to mean a saturated solution of sugar in water, and held:

* * * From all of these we are unable to conclude that the mixture at issue is a sirup in the common meaning of that term, or that any such product was, within the contemplation or intent of Congress, to be regarded as falling within the designation of "sugar sirups" as those words are used in paragraph 502 of the Tariff Act of 1930.

And, further:

It is to be observed that Congress must have had clearly in mind a distinction between "sirups" and "mixtures containing sugar and water" and provided for them in different paragraphs. Congress also distinguished "sirups cf cane, juice, melada" and "sugar sirups," for tariff purposes, the one being named in paragraph 501, *supra*, and the other in paragraph 502, *supra*.

It is of common knowledge, we understand, that each of the articles specified by name in paragraph 501, *supra*, is (unless it be already refined sugars as imported) transmuted into refined sugar, while those specified in paragraph 502, *supra*, generally are used for other purposes than that of being refined.

From a perusal of the two decisions it is apparent that both were based upon holdings that the commodity was not a sugar sirup (1) because it was not a concentrated solution; and (2) because it was not commercially so known. The courts found that it was not a sugar sirup under paragraph 502 either directly or by similitude.

In the case before us we have a saturated solution as shown by the testimony and on that ground it would meet the above test of a sugar sirup. Under the language of the court in the *Cresca* case, above cited, it would fall within the purview of paragraph 502 in that it is used for other purposes than that of being refined, rather than under paragraph 501, which was held to cover articles that are to be transmuted into refined sugar.

The Government contends that in the ordinary meaning of the term "sugar sirup," the instant commodity is excluded from paragraph 502 and cites cases in support of that contention. In a later case, *Cresca Co.* v. *United States*, 17 C. C. P. A. (Customs) 83, T. D. 43376, the commodity before the court was known as grenadine-flavored sirup, consisting of sugar and water, citric or tartaric acid, and vegetable flavoring, testing by the polariscope less than 50 sugar degrees. The court held that it was not a sugar sirup under paragraph 502 because it was not a saturated solution of sugar and water, and further because of the construction given to the phrase "molasses and sugar sirups" in the Tariff Act of 1922 in the cases of *Balfour, Guthrie & Co.* v. *United States*, 14 Ct. Cust. Appls. 78, T. D. 41582,

and *Neuman & Schwiers Co.* v. *United States*, 54 Treas. Dec. 328, T. D. 43024.

Also cited by the Government is the case of *Monteverde Rolandelli & Parodi* v. *United States*, 58 Treas. Dec. 223, T. D. 44233, which involved the proper classification of grenadine sirup and creme-dementhe sirup, testing below 50 sugar degrees by the polariscope. It was there held that the presence of coloring and flavoring matter, which were the distinguishing features of the commodities, precluded their inclusion within the term "sugar sirups." The case of *Mouquin* v. *United States*, 60 Treas. Dec. 415, T. D. 45114, was also cited. In that case the court held that in view of the ruling in the *Monteverde Rolandelli & Parodi* case, *supra*, the addition of the acids in the flavoring matter in the grenadine sirup there involved, had produced a commodity different from sugar sirup, which was properly dutiable as an unenumerated manufactured article. We do not consider these cases as authority for holding that the instant merchandise does not fall within the common meaning of sugar sirups. In the *Cresca* cases, *supra*, the commodity was not a saturated solution of sugar and water, and in the last two cited cases the presence of the coloring and flavoring matter was held to be the distinguishing features of the grenadine and creme-de-menthe sirups. We do not find any evidence that the presence of one-sixteenth to one-eighth of an ounce of flavoring to 1 gallon of sirup is the distinguishing feature of the commodity before us. The record here shows that both the flavored and unflavored sirups appeared the same, have the same general physical characteristics and viscosity, and were used for the same general purposes, and it has been admitted that the unflavored sirup by established practice had been considered "sugar sirup" under paragraph 502 by the customs officials, and was so classified. Moreover, the flavored sirup here involved was not distributed to the ultimate consumer in the form in which imported and it bore no trade name. It was imported for sale to manufacturers and processors. It would therefore seem to fall within that class of products which have been held to be raw materials rather than manufactured products. If so, paragraph 501, *supra*, can have no application, for it is only by virtue of the mixed-material clause in said paragraph 1559 that paragraph 501 can be resorted to. That clause provides for "articles not enumerated, manufactured of two or more materials, * * *."

In the brief Government counsel contends that the instant importations are manufactured articles which by reason of the mixed-material provision in said paragraph 1559 are dutiable as though composed wholly of sugars, which it claims to be the component material of chief value.

Plaintiff, on the other hand, asserts that in advancing this claim the Government overlooks the provision in said paragraph 1559

which requires that "the value of each component material shall be determined by the ascertained value of such material in its condition as found in the article"; that the component of chief value in these importations in such condition is an unflavored partially invert sugar sirup, and that such unflavored invert sirups by established practice have been considered "sirups" and properly dutiable under paragraph 502, *supra*.

We have been unable to find anywhere in the record proof to support plaintiff's allegation that the component of chief value is an unflavored partially invert sugar sirup. The collector classified the importations as in chief value of sugars. His classification is presumptively correct. The burden rests on the plaintiff to establish otherwise. *Cochran Co.* v. *United States*, 10 Ct. Cust. Appls. 62, T. D. 38336; *United States* v. *Bacharach*, 18 C. C. P. A. (Customs) 353, T. D. 44612; *United States* v. *Rice-Stix Dry Goods Co.*, 19 C. C. P. A. (Customs) 232, T. D. 45337; and *United States* v. *McNally*, 21 C. C. P. A. (Customs) 522, T. D. 46973. The appellate court in those cases also announced the method of proving the component material of chief value. In the *Bacharach* case, *supra*, the court used the following language:

The collector's classification and assessment of duty under paragraph 1430 raised the presumption that the component material of chief value was yarns, threads, or filaments, and this fact, when not shown to be incorrect, is determinative of the question. *United States* v. *Bernard, Judae & Co.*, 15 Ct. Cust. Appls. 172, T. D. 42231. The rule has long been settled that the proper method of determining component material of chief value is by determining the value of the separate parts of the article at the time when they are ready to be combined to make the completed article. "Value," when used in this connection, does not relate to the dutiable value of the component materials, but to the cost of such components to the manufacturer of the completed article. There was no proof in this case establishing such a value, and the presumption arising from the collector's classification was not overcome.

While it is noted that the consular invoices contain notations that "manufactured sugar is the component material of chief value," these notations are made in compliance with regulations (T. D. 49867) governing invoices of sugar products and are for the purpose of assessing the sugar tax under the Internal Revenue Code (formerly the Sugar Act of 1937). There, the term "manufactured sugar," upon which the tax is assessed, is defined (section 3507) and such definition includes "sirups." Neither the notation nor the definition can have any evidentiary value in the issue presented here.

However that may be, we must first decide whether the addition of one-sixteenth to one-eighth of an ounce of flavoring to a gallon of sirup so changes the instant commodity that it is no longer a sugar sirup. Or, is the provision for sugar sirups, being an *eo nomine* designation without qualification except as to the polarization test, suffi-

ciently broad to include a sugar sirup to which has been added flavoring which is not the distinguishing feature of the sirup?

In the case of *United States* v. *Procter & Gamble Mfg. Co.*, 34 C. C. P. A. 71, C. A. D. 345, the court had before it certain citronella oil to which had been added, before importation, from 6 to 13.6 per centum of petroleum distillate (kerosene) and it was held that the addition of the petroleum distillate did not remove the commodity from the common meaning of citronella oil. The court there said:

The tariff act makes no distinction between different grades of citronella oil, nor does it make any distinction between the products of different countries. * * * The presence of the petroleum distillate in the merchandise at bar did not affect its use for the purpose for which it was purchased.

* * * * * * *

If the addition of petroleum distillate to citronella oil were shown to result in a product having a use different from the pure product, or, to be more exact, if it destroyed it as citronella oil and fitted it for only a perfume material a different situation would confront us, * * *.

In the case of *United States* v. *Nippon Co. et al.* and *Nippon Co. et al.* v. *United States*, 32 C. C. P. A. 164, C. A. D. 303, a commodity known as nori, a dried seaweed, was involved. After having been dried there was added to the thin sheets a chemical flavoring substance, monosodium glutamate. The court held that the addition of this flavoring substance did not change the articles into something other than kelp, although it may have increased its desirability as a food; that so long as articles remain the articles *eo nomine* provided for without limitation, unless congressional intent is otherwise indicated, they should be classified under *eo nomine* provisions.

In the case of *Nootka Packing Co. et al.* v. *United States*, 22 C. C. P. A. 464, at 470, T. D. 47464, the court, after discussing numerous decisions, held as follows:

The clear weight of the authorities on the subject is that an *eo nomine* statutory designation of an article, without limitations or a shown contrary legislative intent, judicial decision, or administrative practice to the contrary, and without proof of commercial designation, will include all forms of said article.

We are not unmindful of the fact that the above-cited cases involved the question of relative specificity. However, they are valuable as precedents in determining the question whether the addition of this small amount of flavoring changes the instant commodity into something other than the sugar sirup provided for *eo nomine* in paragraph 502, *supra*. Under the principle therein set forth, we are unable to find that the sugar sirup here involved is removed from the purview of said paragraph 502. It is used for the same purpose as the unflavored sirup, which admittedly is classifiable under that paragraph; it has the same general physical characteristics and viscosity; we find no shown contrary legislative intent, judicial decision, or administrative practice to the contrary, and proof of

commercial designation is lacking. Therefore, the *eo nomine* designation in said paragraph 502 includes this form of sugar sirup. Inasmuch as we find that this commodity is enumerated, paragraph 1559, by virtue of which the collector classified the sirup under paragraph 501, *supra*, can have no application.

## The Tax under the Internal Revenue Code

Turning to the claim in the amendments to the protests, is the tax assessed under section 3500 of the Internal Revenue Code (Title 26, U. S. C., 1940 ed.) derived from section 403 of the Sugar Act of 1937 (50 Stat. 913) subject to the 20 per centum Cuban preferential reduction? Plaintiff claims in the brief filed that to deny the 20 per centum reduction in the tax would be a violation of the Cuban Treaty of 1902, the Trade Agreement Act of 1934 (section 350, Tariff Act of 1930), and the declaration of the President in the proclamation covering the Cuban Trade Agreement of 1934 (T. D. 47232). It is contended by plaintiff's counsel that as section 3501 of the Internal Revenue Code expressly provides that the tax levied under section 3500, *supra*, shall be treated as a duty, the preferential reduction provided in Article II of the Cuban Treaty of 1902 must be applied thereto and also that the provision in section 3501, prohibiting the granting of any "preference" in such tax, conflicts with international obligations.

We quote the applicable sections of the Internal Revenue Code as follows:

SEC. 3500. RATE OF TAX.

In addition to any other tax or duty imposed by law, there shall be imposed, under such regulations as the Commissioner of Customs shall prescribe, with the approval of the Secretary, a tax upon articles imported or brought into the United States as follows:

\*          \*          \*          \*          \*          \*          \*

(2) On all manufactured sugar testing by the polariscope less than ninety-two sugar degrees 0.5144 cent per pound of the total sugars therein;

(3) On all articles composed in chief value of manufactured sugar 0.5144 cent per pound of the total sugars therein. (53 Stat. 428.)

SEC. 3501. ASSESSMENT AND PAYMENT.

Such tax shall be levied, assessed, collected, and paid in the same manner as a duty imposed by the Tariff Act of 1930, 46 Stat. 590, 672 (U. S. C., Title 19, ch. 4) and shall be treated for the purposes of all provisions of law relating to the customs revenue as a duty imposed by such Act, except that for the purposes of sections 336 and 350 of such Act (the so-called flexible tariff and trade-agreements provisions) such tax shall not be considered a duty or import restriction, and except that no preference with respect to such tax shall be accorded any articles imported or brought into the United States. (53 Stat. 428.)

Insofar as it relates to the Cuban Treaty of 1902, this claim must be overruled under authority of *Faber, Coe & Gregg (Inc.)* v. *United States,* 19 C. C. P. A. (Customs) 8, T. D. 44851. That case involved an importation of cigars from Cuba, which, in addition to the regular

customs duties, less the preferential, was liable to a stamp tax imposed by the Internal Revenue Act of 1926. The importer claimed that the merchandise was entitled to a reduction of 20 per centum on the sum paid for the revenue stamps, on the ground that such amount constituted a customs duty within the meaning of Article II of the Cuban Treaty of 1902, inasmuch as said sum was required to be collected while the cigars were in customs custody. The court held that such tax, regardless of how it was designated by Congress, was a customs duty, but overruled the claim that the importer was entitled to the preferential reduction on said tax. The court, speaking through HATFIELD, J., after commenting upon the provisions of Articles I, II, and VIII of that treaty, used the following language:

> Then, with full knowledge of the imposition by the laws of the United States of internal-revenue taxes on cigars and other products produced in the United States, and the application of such laws and taxes to like products imported into the United States from foreign countries, subsequent to their importation and prior to their entering into the commerce of the country, the contracting parties provided in Article IX of the treaty that—
>
> it is understood and agreed that any tax or charge that may be imposed by the national or local authorities of either of the two countries *upon the articles of merchandise embraced in the provisions of this convention, subsequent to importation and prior to their entering into consumption in the respective countries, shall be imposed and collected without discrimination upon like articles whencesoever imported.* [Italics quoted.]
>
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
>
> In view of the fact that, generally, customs duties become a lien on imported merchandise at the moment of its arrival within the limits of a port of entry, and, as taxes imposed on imported merchandise, while it retains its "distinctive character" as an import, are customs duties, regardless of whether they are imposed at the time of importation or subsequent thereto, it is obvious that the contracting parties intended to distinguish between the regular tariff duties (made preferential in respect to all like imports from other countries, Articles II and VIII) and other additional taxes, including additional customs duties, imposed on *imported merchandise subsequent to its importation and prior to its entering into consumption* (required by Article IX to be "imposed and collected without discrimination upon like articles whencesoever imported") and to provide that, as to the regular tariff duties, the rates therein provided should continue preferential in respect to all like imports from other countries, whereas the additional taxes, including additional customs duties, should be imposed and collected *without discrimination* upon like articles whencesoever imported. [Italics quoted.]
>
> Accordingly, we are of opinion that appellant is not entitled to a reduction of 20 per centum of the additional customs duties imposed by U. S. C., title 26, section 845, and section 400 of the Revenue Act of 1926, U. S. C., title 26, section 832, *supra*, and we so hold.

Insofar as the Cuban Treaty of 1902 is concerned, the above case is authority for denying plaintiff's claim for applying the 20 per centum preferential to the internal revenue tax here assessed. The clause in section 3501, above set forth, that "Such tax &ast; &ast; &ast; shall be treated for the purposes of all provisions of law relating to the customs revenue as a duty imposed by such Act, &ast; &ast; &ast;" is merely an

adoption by Congress of the ruling in the *Faber, Coe & Gregg (Inc.)* case, *supra*, that such taxes are customs duties.

In the later case of *F. H. Von Damm* v. *United States*, 25 C. C. P. A. (Customs) 97, T. D. 49094, the court held that section 350 (b) of the Tariff Act of 1930 authorized the making of an exclusive agreement with Cuba modifying the preferential treatment previously existing under the Cuban Treaty of 1902. The court there had under consideration the Cuban Trade Agreement of 1934 (T. D. 47232), entered into under authority of said section 350 (b). That trade agreement provided that Cuban products, enumerated or described in schedule II thereto annexed, with respect to which a rate of duty is specified in column 2 of said schedule (including paragraph 501 relating to sugars), when imported into the United States, shall not be subject to any customs duty in excess of the rate so specified "except as provided in Article VIII or X" of said agreement. Article X is not applicable here. Article VIII provides that all articles described in Schedule II, with respect to which a rate of duty is specified in column 2 of said schedule "shall be exempt from all taxes, fees, charges, or exactions, in excess of those imposed" by federal laws "in effect on the day on which this Agreement comes into force," i. e., September 3, 1934.

As this constituted a change of language from that found in the Cuban Treaty of 1902, Faber, Coe & Gregg, Inc., again presented the claim that cigars imported from Cuba on and after the effective date of the Cuban Trade Agreement should be entitled to the reduction of 20 per centum of the revenue taxes. It was again held by the court (*Faber, Coe & Gregg, Inc.* v. *United States*, 26 C. C. P. A. (Customs) 95, T. D. 49638) that the tax assessed under the Revenue Act of 1926 was a customs duty, but that the importer was not entitled to the 20 per centum reduction claimed. The court, in reaching its conclusion, stated:

The high contracting parties knew, of course, that taxes imposed upon merchandise after its importation into the United States may or may not be customs duties; that those imposed while the goods retain their distinctive character as imports are customs duties, as held in the *Faber, Coe & Gregg* case, *supra* [19 C. C. P. A. 8, T. D. 44851], and that those imposed upon goods which have entered into the commerce of the country and lost their distinctive character as imports are not customs duties. Possessed of this information, they, nevertheless, provided in the second paragraph of Article III of the trade agreement that products (cigars among others) described in Schedule II, for which a rate of duty was specified in column 2, should not in any case, "*except* as provided in *Article VIII or X*, be subject to any customs duty in excess of the rate so specified." [Italics quoted.]

It is unthinkable that the parties concerned would have included Article VIII in the excepting clause in the second paragraph of Article III if they had had in mind that the taxes, fees, charges, or exactions mentioned in Article VIII applied only to goods which had entered into the commerce of the country and lost their distinctive character as imports. We think it is clear that they did not intend

to limit the provisions for taxes, fees, etc., contained in Article VIII, to such as were not customs duties, but, on the contrary, intended to include all taxes, fees, etc., whether or not customs duties, and, for that reason, used the phrase "*after importation*" in Article VIII rather than the clause "*subsequent to importation and prior to their entering into consumption,*" contained in Article IX of the treaty of commercial reciprocity. [Italics quoted.]

The tax here involved was imposed under the Sugar Act of September 1, 1937, which was codified as section 3500, Title 26, U. S. C., 1940 ed. In the supplemental Cuban Trade Agreement, effective December 23, 1939 (T. D. 50050), the following new provision appearing in Article III, amending said Article VIII:

No internal Federal taxes shall be imposed on articles the growth, produce or manufacture of the Republic of Cuba, enumerated and described in item 501 of Schedule II [sugars] annexed to this agreement in excess of those imposed on September 3, 1937, or required to be imposed thereafter by laws of the United States of America in effect on September 3, 1937.

Under this amendment it is plain that the high contracting parties in effect agreed that the taxes imposed under the Sugar Act, *supra*, should thereafter be assessed on importations of Cuban sugar, in addition to the customs duty as modified in Schedule II of the agreement.

A second supplemental Cuban Trade Agreement was made, effective January 5; 1942 (T. D. 50541), which again amended Article VIII. This agreement was in effect at the time of the instant importation. We, therefore, must consider its terms. In Article IV thereof, the high contracting parties deleted the last above-quoted paragraph and again amended the last paragraph of said Article VIII to read as follows:

The provisions of this Agreement shall not prevent the Government of either country from imposing at any time on the importation of any article a charge equivalent to an internal tax imposed in respect of a like domestic article or in respect of a commodity from which the imported article has been manufactured or produced in whole or in part.

In the case before us the tax used by the collector, i. e., 0.5144 cent per pound on the total sugars, is equivalent to that imposed upon a like domestic article as found in the provisions of section 3490 (a) (2), Internal Revenue Code (U. S. C., 1940 ed., Title 26), as follows:

SEC. 3490. TAX—(a) RATE.

Upon manufactured sugar manufactured in the United States, there shall be levied, collected and paid a tax, to be paid by the manufacturer at the following rates:

\*        \*        \*        \*        \*        \*        \*

(2) On all manufactured sugar testing by the polariscope less than ninety-two sugar degrees, 0.5144 cent per pound of the total sugars therein.

The term "manufactured sugar" as used therein is defined in section 3507, Internal Revenue Code, and expressly includes sirups. Inasmuch as the high contracting parties agreed to the imposition of a

charge equivalent to that levied upon a like domestic article, we can see no conflict between section 3501, *supra*, and the Cuban Trade Agreement of 1934, as amended. Therefore, plaintiff's contention that to give effect to section 3501 would be contrary to the rule that statutes should not be construed to conflict with international obligations can have no application in this case.

For the reasons above set forth and under authority of the cases cited, the protests are sustained insofar as they claim that the sugar sirups here involved are covered by paragraph 502, *supra*, and overruled as to the claim that as imports from Cuba they are entitled to the 20 per centum reduction from the compensating tax assessable thereon under section 3500 of the Internal Revenue Code.

Judgment will be rendered accordingly.