(C. D. 1481)

MARIANAO SUGAR TRADING CORPORATION *v.* UNITED STATES

United States Customs Court, Third Division

(Decided December 4, 1952)

Sharretts, Hillis & Paley (Howard C. Carter, Louis J. Paley, and Edward P. Sharretts of counsel); Bland & Nairn (Oscar E. Bland and John W. Nairn of counsel), associate counsel, for the plaintiff.

Charles J. Wagner, Acting Assistant Attorney General (Dorothy C. Bennett, special attorney), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges; CLINE, J., not participating

EKWALL, Judge: Plaintiff herein imported a quantity of Cuban sugar which was entered at the port of New York in March 1947, and February and November 1949. Regular customs duties were assessed thereon at appropriate rates under the Tariff Act of 1930 (19 U. S. C. § 1001), as modified by the Cuban Trade Agreements in force on the dates of importation. These regular customs duties are not in dispute in this action. In addition thereto, a tax was assessed under section 3500 of the Internal Revenue Code (26 U. S. C., 1940 and 1946 eds.). As to this assessment, all of the protests claim that the collector should have granted a 20 per centum preferential reduction by virtue of the Cuban Treaty of 1902 (T. D. 24836). Protest 141159–K claims such preference should have been allowed under the Cuban Trade Agreement, concluded August 24, 1934 (T. D. 47232), and protests 157569–K and 161897–K attack the legality of certain provisions of the Cuban Trade Agreements (T. D.'s 47232, 50051 [50050], 50541, and 51819) suspending or abrogating the Cuban Treaty of 1902, as being beyond the scope of the powers granted the President under the Trade Agreements Act (sec. 350, Tariff Act of 1930, as amended (19 U. S. C., sec. 1351)).

On behalf of the Government, it is claimed that such preferential treatment is expressly prohibited by the terms of section 3501 of said Internal Revenue Code, which provides that "no preference with respect to such tax shall be accorded any articles imported or brought

into the United States." The effective period for the enforcement of the Sugar Act of 1937 here involved (section 3500 of the Internal Revenue Code, *supra*) was extended by Congress to June 30, 1953 (61 Stat. 934).

Plaintiff contends that as section 3501, *supra*, expressly provides that the tax levied under section 3500, *supra*, shall be treated as a duty, the preferential reduction provided in Article II of the Cuban Treaty of 1902 must be applied thereto and also that the provision in section 3501, prohibiting the granting of any "preference" in such tax, conflicts with international obligations.

The cases were submitted upon the official papers by plaintiff. The Government moved to dismiss the three protests, which have been consolidated. The grounds of said motion are (1) the question as to whether the 20 per centum Cuban preferential is applicable to assessments imposed under the internal revenue laws is *stare decisis*, under the holding in *Olavarria* v. *United States*, 20 Cust. Ct. 197, C. D. 1110, and plaintiff has presented no new evidentiary matter with respect thereto in the instant case; and (2) the claims in protests 157569–K and 161897–K, attacking the legality of trade agreement provisions suspending or abrogating the Cuban Treaty of 1902, present moot questions, first, because a ruling thereon in favor of plaintiff could accomplish no more than a reinstatement of the Cuban Treaty of 1902, which the courts have held consistently did not grant a 20 per centum preferential against charges imposed under internal revenue laws,[1] and, second, because an abstract ruling on the validity of such trade agreement provisions would have no bearing on the judgment in this case, in view of the later pronouncement of Congress in section 3501, *supra*.

The applicable sections of the Internal Revenue Code are quoted below, insofar as pertinent to the issues here presented:

**Sec. 3500. Rate of tax.**

In addition to any other tax or duty imposed by law, there shall be imposed, under such regulations as the Commissioner of Customs shall prescribe, with the approval of the Secretary, a tax upon articles imported or brought into the United States as follows:

\* \* \* \* \* \* \*

(2) On all manufactured sugar testing by the polariscope less than ninety-two sugar degrees 0.5144 cent per pound of the total sugars therein.

**Sec. 3501. Assessment and payment.**

Such tax shall be levied, assessed, collected, and paid in the same manner as a duty imposed by the Tariff Act of 1930, 46 Stat. 590, 672 (U. S. C., Title 19, ch. 4) and shall be treated for the purposes of all provisions of law relating to the customs

---

[1] *Faber, Coe & Gregg (Inc.)* v. *United States*, 19 C. C. P. A. (Customs) 8, T. D. 44851, and *Olavarria & Co. Inc.* v. *United States*, 20 Cust. Ct. 197, C. D. 1110 (importer's appeal therefrom dismissed, 36 C. C. P. A (Customs) 143).

revenue as a duty imposed by such Act, except that for the purposes of sections 336 and 350 of such Act (the so-called flexible-tariff and trade-agreements provisions) such tax shall not be considered a duty or import restriction, and except that no preference with respect to such tax shall be accorded any articles imported or brought into the United States.

The Reciprocal Trade Agreements Act, *supra*, insofar as pertinent, is set forth below as follows:

Tariff Act of 1930 (Reciprocal Trade Agreements Act, approved June 12, 1934, 48 Stat. 943, ch. 474; 19 U. S. C. sec. 1351):

*Be it enacted* * * * That the Tariff Act of 1930 is amended by adding at the end of title III the following:

### PART III—PROMOTION OF FOREIGN TRADE

SEC. 350. (a) * * * the President * * * is authorized * * *

(1) To enter into foreign trade agreements with foreign governments or instrumentalities thereof; and

(2) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder. * * * The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly; * * *

(b) Nothing in this section shall be construed to prevent the application, with respect to rates of duty established under this section pursuant to agreements with countries other than Cuba, of the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on December 11, 1902, or to preclude giving effect to an exclusive agreement with Cuba concluded under this section, modifying the existing preferential customs treatment of any article the growth, produce, or manufacture of Cuba: *Provided,* That the duties payable on such an article shall in no case be increased or decreased by more than 50 per centum of the duties now payable thereon.

(c) As used in this section, the term "duties and other import restrictions" includes (1) rate and form of import duties and classification of articles, and (2) limitations, prohibitions, charges, and exactions other than duties, imposed on importation or imposed for the regulation of imports.

Whether or not the rule of *stare decisis* shall be followed or departed from is a question entirely within the discretion of the court when called upon to consider a question once decided. *Hertz* v. *Woodman,* 218 U. S. 205. Plaintiff's claim that the issue involved in *Faber, Coe & Gregg (Inc.)* v. *United States,* 19 C. C. P. A. (Customs) 8, T. D. 44851, cited as authority for the holding in the *Olavarria* case, *supra,* was essentially different from the issue here presented will, therefore, be considered by the court. The Government's motion to dismiss is denied.

Considering first the question of whether the Cuban Treaty of 1902 authorizes the preference herein sought, we must examine that treaty.

Articles II and VIII thereof,[2] considered together, grant to Cuban products a reduction of 20 per centum in the "rates of duty" assessable under the 1897 tariff act "or * * * any tariff law * * * subsequently enacted," with the exception that as to Cuban sugar, such preference shall not be greater than 20 per centum reduction from the rates levied under the Tariff Act of 1897. This exception was repealed by section IV, paragraph B, Tariff Act of 1913 (38 Stat. 192), and it is, therefore, not necessary to discuss it further. Article IX [3] of the same treaty by its terms indicates that the high contracting parties realized that taxes or charges other than duties under tariff acts accrued against Cuban imports and, therefore, agreed to the imposition of such additional levies, provided only that they should not be discriminatory in relation to like articles from other countries. This is the interpretation of the treaty as handed down by the courts. See the case of *Faber, Coe & Gregg (Inc.)* v. *United States, supra*. That case involved an importation of cigars from Cuba, entered in 1927. The importer claimed that the preferential 20 per centum ad valorem reduction granted as to the duties under the tariff act then in force should likewise be granted as to the stamp tax imposed under section 400 of the Revenue Act of 1926, then in force. It was contended that since the stamp tax was collectible while the cigars were still in customs custody said tax was a duty within the terms of Article II of the Cuban Treaty of 1902. The appellate court overruled this contention, holding that while the additional tax was, in fact, a customs duty for the reasons claimed, Article II of the Cuban treaty granted the preferential reduction only with respect to regular duties accruing under tariff acts, and that by the terms of Article IX of that treaty additional charges or taxes were treated separately, the only

---

[2] ARTICLE II

During the term of this convention, all articles of merchandise not included in the foregoing Article I [duty-free goods] and being the product of the soil or industry of the Republic of Cuba imported into the United States shall be admitted at a reduction of twenty per centum of the rates of duty thereon as provided by the Tariff Act of the United States approved July 24, 1897, or as may be provided by any tariff law of the United States subsequently enacted.

* * * * * * *

ARTICLE VIII

The rates of duty herein granted by the United States to the Republic of Cuba * * * shall continue * * * preferential in respect to all like imports from other countries, * * * Provided, That while this convention is in force, no sugar imported from the Republic of Cuba * * * shall be admitted into the United States at a reduction of duty greater than twenty per centum of the rates of duty thereon as provided by the tariff act of the United States approved July 24, 1897, and no sugar, the product of any other foreign country, shall be admitted * * * at a lower rate of duty than that provided by the tariff act of * * * July 24 1897. [This proviso was repealed by sec. IV, par. B, Tariff Act of 1913.]

[3] ARTICLE IX

In order to maintain the mutual advantages granted in the present convention by the United States to the Republic of Cuba and by the Republic of Cuba to the United States, it is understood and agreed that any tax or charge that may be imposed by the national or local authorities of either of the two countries upon the articles of merchandise embraced in the provisions of this convention, subsequent to importation and prior to their entering into consumption in the respective countries, shall be imposed and collected without discrimination upon like articles whencesoever imported.

guarantee being that they would be assessed without discrimination in relation to like articles from other countries. On this point, we quote the language of the court as follows:

> Then, with full knowledge of the imposition by the laws of the United States of internal-revenue taxes on cigars and other products produced in the United States, and the application of such laws and taxes to like products imported into the United States from foreign countries, subsequent to their importation and prior to their entering into the commerce of the country, the contracting parties provided in Article IX of the treaty that—

> > it is understood and agreed that any tax or charge that may be imposed by the national or local authorities of either of the two countries *upon the articles of merchandise embraced in the provisions of this convention, subsequent to importation and prior to their entering into consumption in the respective countries, shall be imposed and collected without discrimination upon like articles whencesoever imported.* [Italics ours.]

> \* \* \* \* \* \* \*

> In view of the fact that, generally, customs duties become a lien on imported merchandise at the moment of its arrival within the limits of a port of entry, and, as taxes imposed on imported merchandise, while it retains its "distinctive character" as an import, are customs duties, regardless of whether they are imposed at the time of importation or subsequent thereto, it is obvious that the contracting parties intended to distinguish between the regular tariff duties (made preferential in respect to all like imports from other countries, Articles II and VIII) and other additional taxes, including additional customs duties, imposed on *imported merchandise subsequent to its importation and prior to its entering into consumption* (required by Article IX to be "imposed and collected without discrimination upon like articles whencesoever imported"), and to provide that, as to the regular tariff duties, the rates therein provided should continue preferential in respect to all like imports from other countries, whereas the additional taxes, including additional customs duties, should be imposed and collected *without discrimination* upon like articles whencesoever imported.

> Accordingly, we are of opinion that appellant is not entitled to a reduction of 20 per centum of the additional customs duties imposed by U. S. C., title 26, section 845, and section 400 of the Revenue Act of 1926, U. S. C., title 26, section 832, *supra*, and we so hold.

In the *Olavarria* case, *supra*, the issue involved, insofar as the instant case is concerned, was whether the 20 per centum preferential granted under the Cuban Treaty of 1902 was applicable to an importation of Cuban sugar sirup. This court, in denying plaintiff's claim that said Cuban sugar sirup was entitled to the reduction, quoted at length from the decision of our appellate court in *Faber, Coe & Gregg (Inc.)*, *supra*, and held that section 3501, *supra*, when considered in its entirety, was merely an adoption by the Congress of the court's ruling in that case, stating:

> Insofar as it relates to the Cuban Treaty of 1902, this claim must be overruled under authority of *Faber, Coe & Gregg (Inc.) v. United States*, 19 C. C. P. A. (Customs) 8, T. D. 44851. That case involved an importation of cigars from Cuba, which, in addition to the regular customs duties, less the preferential, was liable to a stamp tax imposed by the Internal Revenue Act of 1926. The importer

claimed that the merchandise was entitled to a reduction of 20 per centum on the sum paid for the revenue stamps, on the ground that such amount constituted a customs duty within the meaning of Article II of the Cuban Treaty of 1902, inasmuch as said sum was required to be collected while the cigars were in customs custody. The court held that such tax, regardless of how it was designated by Congress, was a customs duty, but overruled the claim that the importer was entitled to the preferential reduction on said tax.

\*    \*    \*    \*    \*    \*    \*

Insofar as the Cuban Treaty of 1902 is concerned, the above case is authority for denying plaintiff's claim for applying the 20 per centum preferential to the internal revenue tax here assessed. The clause in section 3501, above set forth, that "Such tax \* \* \* shall be treated for the purposes of all provisions of law relating to the customs revenue as a duty imposed by such Act, \* \* \*" is merely an adoption by Congress of the ruling in the *Faber, Coe & Gregg (Inc.)* case, *supra*, that such taxes are customs duties.

Plaintiff contends that the decision in the *Olavarria* case, *supra*, was in error. It is argued in the brief on behalf of plaintiff that there was no provision in 26 U. S. C. § 845 requiring that such stamp tax be levied, assessed, collected, and paid in the same manner as a duty, nor that such tax shall be treated for the purposes of all provisions of law relating to the customs revenue as a duty imposed by such act, as is the case of the tax on sugar provided for in sections 3500 and 3501 of the Sugar Act of 1937, *supra*. It is contended that the tax imposed in the *Faber, Coe & Gregg (Inc.)*, case, *supra*, although a customs duty was imposed subsequent to importation and prior to the time the goods entered into consumption, and was, therefore, excluded from the preferential reduction of duty prescribed in Articles II and VIII of the Cuban Treaty of 1902 by virtue of Article IX of that treaty. Further, that the said case holds that generally customs duties become a lien on imported merchandise at the moment of its arrival within the limits of a port of entry. Plaintiff also contends that the right to duties on imported merchandise accrues to the Government and also the obligation to pay the same at the moment the merchandise is imported, the rate and amount thereof to be duly determined under the law in force at the time of importation. Also, that under the mandate of section 3501, *supra*, the tax assessed under section 3500, *supra*, "shall be levied, assessed, collected, and paid in the same manner as a duty imposed by the Tariff Act of 1930 \* \* \* and shall be treated for the purposes of all provisions of law relating to the customs revenue as a duty imposed by such Act \* \* \*," with certain exceptions. Counsel for the plaintiff, therefore, concludes that the tax imposed by section 3500, *supra*, is imposed at the time of importation and is not excluded from the preferential reduction by virtue of Article IX of the Cuban treaty, *supra*.

The court is not in agreement with this strained construction of the revenue statute. Section 3501, *supra*, contains two separate and distinct excepting clauses as follows:

\* \* \* except that for the purposes of sections 336 and 350 of such Act (the so-called flexible-tariff and trade-agreement provisions) such tax shall not be considered a duty or import restriction, and except that no preference with respect to such tax shall be accorded any articles imported or brought into the United States.

Plaintiff treats these as one exception. Moreover, this construction ignores the fact that Congress mentioned section 350 (the Trade Agreements Act) in only the first of these exceptions, with the purpose of prescribing that the sugar tax shall not be considered "a duty or import restriction" thereunder. Counsel, in effect, adds the words "section 350" to the second excepting clause "that no preference with respect to such tax shall be accorded any articles imported or brought into the United States," in order to limit the application of the prohibition against preferences to trade agreement preferences. The exception, as enacted, is devoid of language that would warrant such a construction. Therefore, we find that the claim for the preferential reduction under Article II, *supra*, is predicated upon an erroneous construction of the congressional language in section 3501. It is the opinion of the court, and we so hold, that under the exceptions set forth in said section 3501 the sugar tax remained an additional tax or charge other than a regular customs duty, so far as preferences are concerned. Its preferential status, therefore, is the same as the tax imposed on cigars in the *Faber, Coe & Gregg (Inc.)* case, *supra*, and is within the provisions of Article IX of the Cuban Treaty of 1902 for the reasons set forth in that decision. This was the holding of the court in the *Olavarria* case, *supra*, which we find is controlling of the issue here presented.

Plaintiff contends that the declarations in the Cuban Trade Agreements that the Cuban Treaty of 1902 is suspended or inoperative, are invalid, or, if valid for any purpose, are confined to the application of the Cuban Treaty of 1902 to the trade agreement in which the declaration is made and cannot affect the application of Articles II and VIII of the Cuban Treaty of 1902 to taxes provided in section 3500 of the Sugar Act of 1937. Plaintiff does not question the authority of the President to modify the reduction in duty prescribed in the earlier trade agreement with Cuba and admits that the Cuban Trade Agreements provide for a greater reduction of the duties provided for in paragraph 501, *supra*, than the Cuban Treaty of 1902 required.

Article XVI of the trade agreement with Cuba of August 24, 1934 (T. D. 47232), provides:

The operation of the provisions of the Commercial Convention, concluded between the United States of America and the Republic of Cuba on December 11, 1902, shall be suspended on the day on which the present Agreement comes into force. In the event of the expiration or the denunciation of the present Agreement, the provisions of the aforesaid Convention of 1902 shall automatically resume operation and shall continue in full force and effect as provided therein

until the expiration of one year from the day on which the Government of either country shall have given notice to the other Government of an intention to terminate it.

Substantially the same provision appeared in the Supplemental Cuban Trade Agreement of December 23, 1939 (T. D. 50050), and in the Cuban Trade Agreement of January 5, 1942 (T. D. 50541), and, finally, the Exclusive Trade Agreement with Cuba contained, in the General Agreement on Tariffs and Trade (T. D. 51819), a provision that the Cuban Treaty of 1902 is inoperative.

Plaintiff's contention is tantamount to saying that section 350 (b) of the Trade Agreements Act, *supra*, while it authorized the President to conclude exclusive trade agreements with Cuba "modifying" the preferential customs treatment extended to the products of that country under the 1902 treaty, denied him the authority to obtain Cuban acquiescence in suspension of the treaty provisions superseded by such modifications.

In considering this question, an examination of tariff history in this country from early times is pertinent. At various times, from the time of Washington to the present time, very broad powers have been conferred on the President in connection with the regulation and promotion of trade and commerce and in the application of provisions of the various tariff acts.

These powers have included the right of the President—

(1) To lay embargoes on ships and vessels (act of June 4, 1794).

(2) To remit and discontinue restraints and prohibitions prescribed by Congress with respect to commercial intercourse (acts of February 9, 1799, and December 19, 1806).

(3) To revive restrictions and prohibitions with respect to commercial intercourse previously removed (acts of March 1, 1809, and May 1, 1810).

(4) To declare the repeal of acts imposing duties on the tonnage of ships and vessels and on goods, wares, and merchandise (acts of March 3, 1815, and May 31, 1830).

(5) To suspend the free entry of specified articles and to enter into Executive agreements for the free introduction of such articles on a basis of reciprocity (act of October 1, 1890).

(6) To enter into commercial agreements granting reciprocal and equivalent concessions, and to suspend by proclamation the imposition and collection of duties provided for by Congress (act of July 24, 1897).

(7) To grant minimum rates prescribed by Congress on imports (act of August 5, 1909).

(8) (a) To lower or raise duties to equalize cost of production, (b) to exclude articles from importation on grounds of unfair competition, (c) to specify and declare new and additional duties when

discrimination against American products was found to exist (acts of September 21, 1922, and June 17, 1930).

These powers have been consistently upheld by the courts. Moreover, it is noted that out of the very large number of agreements that have been entered into by the President without the consent of the Senate, relatively few have been questioned in the courts. This delegation of power must, however, be confined within certain limitations and the courts have indicated in a general way what these limitations should be. While the terms of the limitations have varied in the different decisions, the tests as indicated by the courts that such legislation must meet are substantially as follows:

(1) That Congress must prescribe the policy and plan to be followed, leaving to the President merely the execution of such policy and plan; (2) that while the President may not exercise discretion as to what the policy or the law shall be, authority may be conferred on him to exercise discretion in the execution of such policy or law; (3) that Congress may provide that the enforcement of the law shall depend upon future events or upon the ascertainment of facts, leaving to the President the determination of the happening of the events, of the existence of the facts; (4) that—

* * * If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power (*Hampton & Co.* v. *United States*, 276 U. S. 409).

Under the Constitution, there is ample authority for the delegation by the Congress to the Executive of power to conclude Executive agreements brought into force by proclamations, without reference to Congress, as to tariff matters, as in the judgment of the Congress may be in the interest of American trade and commerce, and a reasonable delegation of such power, with proper limitations, and the exercise of the authority by the Executive, with proper regard for the wishes of Congress, are clearly not incompatible with the supreme law of the land.

Moreover, the President has inherent powers to negotiate in the field of international relations. In the case of *United States* v. *Curtiss-Wright Corp.*, 299 U. S. 304, Mr. Justice Sutherland reviewed the origin and scope of those powers of the President as follows:

It will contribute to the elucidation of the question if we first consider the differences between the powers of the federal government in respect of foreign or external affairs and those in respect of domestic or internal affairs. That there are differences between them, and that these differences are fundamental, may not be doubted.

    *        *        *        *        *        *        *

It results that the investment of the federal government with the powers of external sovereignty did not depend upon the affirmative grants of the Constitution. The powers * * * to make treaties., * * * if they had

never been mentioned in the Constitution, would have vested in the federal government as necessary concomitants of nationality. Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens  \*  \*  \*; and operations of the nation in such territory must be governed by treaties, international understandings and compacts, and the principles of international law. As a member of the family of nations, the right and power of the United States in that field are equal to the right and power of the other members of the international family. Otherwise, the United States is not completely sovereign. The power to acquire territory  \*  \*  \* the power to make such international agreements as do not constitute treaties in the constitutional sense (*Altman & Co.* v. *United States*, 224 U. S. 583, 600–601); Crandall, Treaties, Their Making and Enforcement, 2d ed., p. 102 and note 1), none of which is expressly affirmed by the Constitution, nevertheless exist as inherently inseparable from the conception of nationality. This the court recognized, and in each of the cases cited found the warrant for its conclusions not in the provisions of the Constitution, but in the law of nations.

\*      \*      \*      \*      \*      \*      \*

Not only, as we have shown, is the federal power over external affairs in origin and essential character different from that over internal affairs, but participation in the exercise of the power is significantly limited. In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation. He *makes* treaties with the advice and consent of the Senate; but he alone negotiates. Into the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it. As Marshall said in his great argument of March 7, 1800, in the House of Representatives, "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." Annals, 6th Cong., col. 613. The Senate Committee on Foreign Relations at a very early day in our history (February 15, 1816), reported to the Senate, among other things, as follows: [Italics quoted.]

"The President is the constitutional representative of the United States with regard to foreign nations. He manages our concerns with foreign nations and must necessarily be most competent to determine when, how, and upon what subjects negotiation may be urged with the greatest prospect of success. For his conduct he is responsible to the Constitution. The committee consider this responsibility the surest pledge for the faithful discharge of his duty. They think the interference of the Senate in the direction of foreign negotiations calculated to diminish that responsibility and thereby to impair the best security for the national safety. The nature of transactions with foreign nations, moreover, requires caution and unity of design, and their success frequently depends on secrecy and dispatch." U. S. Senate, Reports, Committee on Foreign Relations, vol. 8, p. 24.

It is important to bear in mind that we are here dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution. It is quite apparent that if, in the maintenance of our international relations, embarrassment—perhaps serious embarrassment—is to be avoided and success for our aims achieved, congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord

to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved.  *  *  *
*  *  *  *  *  *  *
When the President is to be authorized by legislation to act in respect of a matter intended to affect a situation in foreign territory, the legislator properly bears in mind the important consideration that the form of the President's action—or, indeed, whether he shall act at all—may well depend, among other things, upon the nature of the confidential information which he has or may thereafter receive, or upon the effect which his action may have upon our foreign relations. This consideration, in connection with what we have already said on the subject, discloses the unwisdom of requiring Congress in this field of governmental power to lay down narrowly definite standards by which the President is to be governed.  *  *  *

In view of these inherent powers of the President to negotiate, we will examine the Trade Agreements Act, *supra*. We find section 350 (a) (1) and (2) of that act grants to the President power to "enter into foreign trade agreements with foreign governments," and "proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance  *  *  * of existing customs or excise treatment  *  *  * as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder." It is further provided in subparagraph (a) (2) that the duties so proclaimed shall apply equally to products of all foreign countries and, for the purpose of excepting Cuba from that provision, Congress enacted subparagraph (b) thereof. That subparagraph provides that the Trade Agreements Act shall neither prevent the preferences granted by the 1902 Cuban treaty from being applied to new rates of duty established by trade agreements, concluded with countries other than Cuba, nor preclude the President from negotiating an exclusive trade agreement with Cuba "modifying the existing preferential customs treatment of any article" of Cuban origin, provided solely that such changes shall not increase or decrease existing duties on Cuban products by more than 50 per centum. On September 26, 1949 (sec. 6, Public Law 307, 63 Stat. 697, ch. 585), this proviso was deleted, and Congress imposed a new maximum governing Cuban trade agreement rates equal to the duties applicable to imports from other countries, and a new minimum of 50 per centum under the rates applicable to Cuban products on January 1, 1945. Since the language of section 350 (b) does not except Cuban products from the provision in section 350 (a) (2), *supra*, authorizing the President to proclaim "such continuance  *  *  * of existing customs or excise treatment" as may be "required or appropriate to carry out any foreign trade agreement  *  *  * entered into hereunder," the last-quoted provision applies to Cuba as well as to other foreign countries. Therefore, Congress, without invading the President's inherent powers to negotiate with Cuba, specifically authorized such officer (1) to conclude an exclusive

trade agreement with that country, modifying the customs treatment then existing under the Cuban Treaty of 1902, within the 50 per centum limitations, and (2) to proclaim such modifications and such continuance of existing customs treatment of Cuban imports as may be "required or appropriate to carry out" any Cuban trade agreement concluded thereunder.

The President thereafter negotiated, concluded, and proclaimed the Cuban Trade Agreement of 1934 (T. D. 47232) in which the preferential treatment of Cuban imports, then existing, was modified. In this trade agreement Cuba joined and, as a further indication of its acquiescence in the modified preferential treatment therein provided, specifically consented, in Article XVI of that agreement, *supra*, that the preferences granted by the 1902 treaty should be inoperative so long as the 1934 trade agreement remained in force. This was necessary in order to avoid the conflicting preferences of the treaty and the trade agreement.

In regard to the Cuban Trade Agreement of 1934, our appellate court in *Louis Wolf et al.* v. *United States*, 27 C. C. P. A. (Customs) 188, C. A. D. 84, held that it was a "commercial convention although it was not ratified by the Senate." We quote the language of the court, speaking through the late Judge Bland, as follows:

\* \* \* We think that by the use of the term "commercial convention" such a trade agreement as the Cuban Trade Agreement of 1934 was intended to be included, and it is our opinion that that agreement is a commercial convention although it was not ratified by the Senate. \* \* \* We think it well settled that the term "commercial convention" is broad enough not only to include commercial conventions which are ratified by the Senate when negotiated by the executive department of the Government, but that it also includes certain commercial agreements which may be authorized by Congress, if such conventions are within the powers so delegated.

On this phase of the case we think it proper to say that the President, pursuant to acts of Congress, frequently has entered into agreements with foreign states. For instance, he has concluded engagements concerning commerce and navigation, and in the form of reciprocal arrangements for the suspension of duties in return for equitable concessions. See Crandall, "Treaties (etc.)," 2nd edition, paragraph 62. See also Proclamation of President Theodore Roosevelt, December 5, 1907, announcing the conclusion of a commercial agreement with Great Britain under the tariff act of 1897, Malloy "Treaties (etc.)," Vol. I, page 812.

In the case of *Von Damm* v. *United States*, 25 C. C. P. A. (Customs) 97, T. D. 49094, our appellate court held that the Cuban Trade Agreement of 1934 was clearly within the authority conferred upon the President by the Trade Agreements Act. We quote the language of the court as follows:

We have no doubt that, as thus analyzed, section 350 (b) authorizes the President to enter into a reciprocal trade agreement with Cuba modifying the preference granted by the Commercial Reciprocity Treaty by according to Cuba changes in the 20 per centum preferential rate and by fixing preferential specific duties.

It follows from what we have said that section 350 authorizes such a trade agreement with Cuba as is here involved.

\* \* \* \* \* \* \*

It seems to us that the Cuban agreement embodies a practicable plan for exclusive preferential duties on Cuban products, both by naming specific preferential duties and by preferential reduction percentages, and is clearly within the authority conferred upon the President by the Reciprocal Tariff Act.

In the above case, the modifications consisted not only of changes in the 20 per centum general preference granted under the Cuban Treaty of 1902, but also in fixing specific preferential rates of duty on certain Cuban products. It is clear that such preferential treatment, in effect, nullified the general 20 per centum preference agreed upon in the 1902 treaty. This was recognized by the appellate court in *Louis Wolf et al.* v. *United States, supra,* for there the court said:

Moreover, on the first question here decided we have held in substance that the Reciprocal Trade Agreements Act and the agreement with Cuba entered into thereunder, were intended to and effectively did insure Cuba an exclusive preference in respect to merchandise embraced in said Cuban agreement. It must necessarily follow, we think, that any treaty to the contrary, entered into prior to the effective date of the agreement, would be repealed or nullified. \* \* \*

The preferences agreed upon in the Cuban Trade Agreements, and subsequently proclaimed by the President, obviously nullify the general 20 per centum preference set forth in Article II of the Cuban Treaty of 1902. Apparently recognizing that fact, the high contracting parties mutually agreed that the said treaty should be inoperative during the life of the Cuban Trade Agreements. In order to obtain an orderly administration of the provisions of the said trade agreements, such suspension was essential and was clearly within the power delegated to the President in section 350 (a) (2), *supra,* to "proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance \* \* \* of existing customs or excise treatment \* \* \* as are required or appropriate to carry out any foreign trade agreement \* \* \* entered into hereunder."

We therefore find and so hold that the proclamations of the President here involved are within the authority expressly granted the President under section 350 (a) (2), *supra,* to proclaim such continuance of existing customs treatment as might be required to carry out the Cuban Trade Agreements, and that the said proclamations and trade agreements clearly indicate a mutual arrangement to suspend operation of all provisions of the 1902 treaty for the periods therein named. It is, therefore, apparent that plaintiff's contention that the suspension of the Cuban Treaty of 1902 is invalid, is devoid of merit.

We are unable to agree with plaintiff's further contention that the suspension of the 1902 treaty was not intended to include additional

duties or taxes covered by Article IX of that treaty, but find that the prohibition in section 3501, *supra*, against preferential treatment in connection with the sugar tax here involved, is in conformity with international obligations existing between Cuba and the United States for the following reasons.

Article III of the Cuban Trade Agreement of 1934, set forth below,* places a limitation on the rate of duty applicable to Cuban products, with respect to which a rate of duty is specified in column 2 of Schedule II thereof, "except as provided in Article VIII or X" of said agreement. A rate of duty is specified in said column 2 for sugars classifiable under paragraph 501 of the tariff act, the merchandise here involved. The first paragraph of Article VIII** continues in force the policy outlined in Article IX of the Cuban Treaty of 1902, in that it restates that additional federal internal taxes or charges shall be nondiscriminatory with respect to Cuban imports. By the second paragraph, it is provided that merchandise, with respect to which a rate of duty is specified in column 2 of Schedule II, "shall be exempt from all taxes, fees, charges, or exactions, in excess of those imposed" by federal laws "in effect on the day on which this Agreement comes into force," i. e., September 3, 1934. It will thus be seen that Article VIII modified the provisions of Article IX of the Cuban Treaty of 1902 in that it fixed a maximum beyond which additional internal

<hr>

*ARTICLE III

Articles the growth, produce, or manufacture of the Republic of Cuba, enumerated and described in Schedule II annexed hereto and made a part of this Agreement, shall, on their importation into the United States of America, be granted exclusive and preferential reductions in duties not less than the percentages specified respectively in Column 1 of the said Schedule, such percentages of reduction being applied to the lowest rates of duty, respectively, now or hereafter payable on like articles the growth, produce, or manufacture of any other foreign country.

No article the growth, produce, or manufacture of the Republic of Cuba, enumerated and described in Schedule II annexed hereto, with respect to which a rate of duty is specified in Column 2 of the said Schedule, shall in any case, except as provided in Articles VIII or X, be subject to any customs duty in excess of the rate so specified.

Every article the growth, produce, or manufacture of the Republic of Cuba which is not provided for in Article I, and which is not enumerated and described in Schedule II annexed to this Agreement, shall, on importation into the United States of America, be granted an exclusive and preferential reduction in duty of not less than 20 per centum, such percentage of reduction being applied to the lowest rate of duty now or hereafter payable on the like article the growth, produce, or manufacture of any other foreign country.

**ARTICLE VIII

All articles the growth, produce, or manufacture of the United States of America or the Republic of Cuba, shall, after importation into the territory of the other country, be exempt from national or federal internal taxes, fees, charges, or exactions, other or higher than those payable on like articles of national or any other foreign origin.

All articles enumerated and described in Schedule I annexed to this Agreement, with respect to which a rate of duty is specified in Column 2 of the said Schedule, shall be exempt from all taxes, fees, charges, or exactions, in excess of those imposed or required to be imposed by laws of the Republic of Cuba in effect on the day on which this Agreement comes into force; and all articles enumerated and described in Schedule II annexed to this Agreement, with respect to which a rate of duty is specified in Column 2 of the said Schedule, shall be exempt from all taxes, fees, charges, or exactions, in excess of those imposed or required to be imposed by laws of the United States of America in effect on the day on which this Agreement comes into force.

The provisions of this Article insofar as they apply to taxes, fees, charges, or exactions imposed within the United States of America, shall apply only to such taxes, fees, charges, or exactions as are subject to statutory control by the Federal Government of the United States of America.

federal taxes or charges would not be assessable on, among other commodities, sugars, such maximum to be the taxes or charges in effect on September 3, 1934. Under the new language of the 1934 Cuban Trade Agreement, Faber, Coe & Gregg, Inc., again brought suit to determine the question of whether Cuban cigars should be granted a 20 per centum preferential from the additional tax imposed under section 400 of the Revenue Act of 1926. This court again overruled plaintiff's claim. *Faber, Coe & Gregg, Inc.* v. *United States*, 71 Treas. Dec. 491, T. D. 48882.

This was the state of the law on September 1, 1937, when Congress enacted the Sugar Act of 1937, here involved (50 Stat. 903, 912–914), section 403 (b) of which was in identical language to that found in section 3501 of the present Internal Revenue Code, including the prohibition against granting any preferences with respect to such tax. Because said statute conflicted with the provisions of Article VIII of the 1934 Cuban Trade Agreement, the President concluded a Supplemental Cuban Trade Agreement, effective December 23, 1939 (T. D. 50050), in which Article VIII of the 1934 agreement was amended (Article III). We set out for convenience of reference the last two paragraphs of said amendment:

No internal Federal taxes shall be imposed on articles the growth, produce or manufacture of the Republic of Cuba enumerated and described in item 501 of Schedule II annexed to this Agreement in excess of those imposed on September 3, 1937 * * *.

The provisions of Article I and Article III of this Agreement and of the third paragraph of this Article shall not prevent the Government of the United States of America from imposing at any time on the importation of any article a charge equivalent to an internal tax imposed in respect of a like domestic article or in respect of a commodity from which the imported article has been manufactured or produced in whole or in part.

It is therefore clear that Cuba, in 1939, consented to the imposition of taxes on sugar under the Sugar Act of 1937, which prohibited preferential treatment with respect to such tax and which became effective on September 1, 1937.

In 1941, when our trade relations with Cuba were again under revision, Article VIII of the Cuban Trade Agreement of 1934 was again amended. (Article IV of Second Supplemental Cuban Trade Agreement, T. D. 50541, effective January 5, 1942.) By that amendment, the paragraph limiting the taxes applicable to Cuban sugar to those in effect on September 3, 1937, was deleted, and the general paragraph relating to the imposition of charges equal to domestic taxes was again amended so that it read as follows:

The provisions of this Agreement shall not prevent the Government of either country from imposing at any time on the importation of any article a charge equivalent to an internal tax imposed in respect of a like domestic article or in respect of a commodity from which the imported article has been manufactured or produced in whole or in part.

This was the status of the Cuban Trade Agreement in March 1947, when entry was made of the sugar involved in protest 141159–K. At that time, all Cuban imports were subject to internal taxes imposed by the United States on like domestic articles. Domestic sugar like that here involved was assessable under section 3490 of the Internal Revenue Code (26 U. S. C., 1946 ed., sec. 3490). The rates therein provided were the same as those set forth in section 3500 of the same statute, under which the sugar involved in protest 141159–K was assessed. It is clear, therefore, that the assessment in that case meets the requirements of Article IV of the Second Supplemental Cuban Trade Agreement of 1942, in force at the time that shipment was imported.

As to the sugar involved in protests 157569–K and 161897–K, imported in February and November 1949, the tax was likewise applicable to that merchandise under subsequent trade agreements then in force, for the following reasons.

The General Agreement on Tariffs and Trade (T. D. 51802), which became effective January 1, 1948, was entered into by the representatives of 23 countries, among which were the United States and Cuba. Concurrently with that agreement, the President concluded a new and exclusive trade agreement with Cuba (T. D. 51819), also effective January 1, 1948. These two agreements must be read together. The pertinent provisions of the two agreements are as follows:

Exclusive Trade Agreement With Cuba (concluded October 30, 1947, effective January 1, 1948, T. D. 51819):

The Governments of the United States of America and the Republic of Cuba,

Having participated in the framing of a General Agreement on Tariffs and Trade, hereinafter referred to as the General Agreement, and a Protocol of Provisional Application, the texts of which have been authenticated by the Final Act adopted at the conclusion of the Second Session of the Preparatory Committee of the United Nations Conference on Trade and Employment, signed this day,

Hereby agree as follows:

1. The Convention of Commercial Reciprocity between the United States of America and the Republic of Cuba signed December 11, 1902, and the Reciprocal Trade Agreement between the United States of America and the Republic of Cuba signed August 24, 1934, with its accompanying exchange of notes, as amended by the supplementary trade agreement signed December 18, 1939, with its accompanying protocol and exchange of notes, and by the supplementary trade agreement signed December 23, 1941, with its accompanying exchange of notes, shall be inoperative for such time as the United States of America and the Republic of Cuba are both contracting parties to the General Agreement as defined in Article XXXII thereof.

2. For such time as the United States of America and the Republic of Cuba are both contracting parties to the General Agreement, the products of either country imported into the other shall be accorded customs treatment as follows:

(a) The provisions of Part II of Schedule IX of the General Agreement shall apply exclusively to products of the United States of America, and the provisions of Part II of Schedule XX of the General Agreement shall apply exclusively to products of the Republic of Cuba.

(b)   Products of the United States of America described in Part I, but not in Part II, of Schedule IX of the General Agreement, imported into the Republic of Cuba, and products of the Republic of Cuba described in Part I, but not in Part II, of Schedule XX of the General Agreement, imported into the United States of America, shall be subject to the customs treatment provided for in Part I of the applicable Schedule.

(c)   Subject to the principles set forth in Article 17 of the Draft Charter for an International Trade Organization   *   *   *.

(i)   *   *   *

(ii)   any product of the Republic of Cuba not described in either Part of Schedule XX of the General Agreement, which would have been subject to ordinary customs duty if imported into the United States of America on April 10, 1947, any temporary or conditional exemption from duty to be disregarded, and which is of a kind which the Government of the United States of America shall determine to have been imported into its territory as a product of Cuba in any quantity during any of the calendar years 1937, 1939, 1944, and 1945, shall be entitled upon importation into the United States of America to a margin of preference in the applicable rate of duty equal to the absolute difference between the most-favored-nation rate for the like product existing on April 10, 1947, including any such rate temporarily suspended, and the preferential rate likewise existing on that date in respect of such product of the Republic of Cuba.

(d)   Any product of the United States of America or of the Republic of Cuba for which customs treatment is not prescribed above shall be dutiable, when imported into the other country, at the most-favored-nation rate of duty of the importing country for the like product.

(e)   *   *   *

3.   The term "most-favored-nation rate" in this Exclusive Supplementary Agreement means the maximum rate which may be, or could have been, applied consistently with the principles set forth in Article I of the General Agreement to a product of a country which is a contracting party to that Agreement.

General Agreement on Tariffs and Trade (T. D. 51802):

The Governments of the Commonwealth of Australia, the Kingdom of Belgium, the United States of Brazil, Burma, Canada, Ceylon, the Republic of Chile, the Republic of China, the Republic of Cuba, the Czechoslovak Republic, the French Republic, India, Lebannon, the Grand Duchy of Luxemburg, the Kingdom of the Netherlands, New Zealand, the Kingdom of Norway, Pakistan, Southern Rhodesia, Syria, the Union of South Africa, the United Kingdom of Great Britain and Northern Ireland, and the United States of America:

*        *        *        *        *        *        *

Being desirous of contributing to these objectives by entering into reciprocal and mutually advantageous arrangements directed to the substantial reduction of tariffs and other barriers to trade and to the elimination of discriminatory treatment in international commerce;

Have through their Representatives agreed as follows:

## PART I

### Article I

#### General Most-Favoured-Nation Treatment

1.   With respect to customs duties and charges of any kind imposed on or in connection with importation or exportation or imposed on the international transfer of payments for imports or exports, and with respect to the method of

levying such duties and charges, and with respect to all rules and formalities in connection with importation and exportation, and with respect to all matters referred to in paragraphs 1 and 2 of Article III, any advantage, favour, privilege or immunity granted by any contracting party to any product originating in or destined for any other country shall be accorded immediately and unconditionally to the like product originating in or destined for the territories of all other contracting parties.

2. The provisions of paragraph 1 of this Article shall not require the elimination of any preferences in respect of import duties or charges which do not exceed the levels provided for in paragraph 3 of this Article and which fall within the following descriptions:

    (a)   *   *   *

    (b)   *   *   *

    (c)   preferences in force exclusively between the United States of America and the Republic of Cuba;

    (d)   *   *   *

3. The margin of preference on any product in respect of which a preference is permitted under paragraph 2 of this Article but is not specifically set forth as a maximum margin of preference in the appropriate schedule annexed to this Agreement shall not exceed

    (a)   in respect of duties or charges on any product described in such Schedule, the difference between the most-favoured-nation and preferential rates provided for therein; if no preferential rate is provided for, the preferential rate shall for the purposes of this paragraph be taken to be that in force on April 10, 1947, and, if no most-favoured-nation rate is provided for, the margin shall not exceed the difference between the most-favoured-nation and preferential rates existing on April 10, 1947;

    (b)   in respect of duties or charges on any product not described in the appropriate Schedule, the difference between the most-favoured-nation and preferential rates existing on April 10, 1947.

     *        *        *        *        *        *        *

## Article II
### Schedules of Concessions

1.   (a)   *   *   *

    (b)   *   *   *

    (c)   The products described in Part II of the Schedule relating to any contracting party, which are the products of territories entitled under Article I to receive preferential treatment upon importation into the territory to which the Schedule relates, shall, on their importation into such territory, and subject to the terms, conditions or qualifications set forth in that Schedule, be exempt from ordinary customs duties in excess of those set forth and provided for in Part II of that Schedule. Such products shall also be exempt from all other duties or charges of any kind imposed on or in connection with importation in excess of those imposed on the date of this Agreement or those directly and mandatorily required to be imposed thereafter by legislation in force in the importing territory on that date. Nothing in this Article shall prevent any contracting party from maintaining its requirements existing on the date of this Agreement as to the eligibility of goods for entry at preferential rates of duty.

2. Nothing in this Article shall prevent any contracting party from imposing at any time on the importation of any product

    (a)   a charge equivalent to an internal tax imposed consistently with the provisions of paragraph 1 of Article III in respect of the like domestic product

or in respect of an article from which the imported product has been manufactured or produced in whole or in part.

\*     \*     \*     \*     \*     \*     \*

## PART II
### Article III
*National Treatment on Internal Taxation and Regulation*

1. The products of the territory of any contracting party imported into the territory of any other contracting party shall be exempt from internal taxes and other internal charges of any kind in excess of those applied directly or indirectly to like products of national origin.   \*   \*   \*

[Foregoing provision in substance now included in paragraph 2 of Article III, by amendment duly proclaimed (T. D. 52167), effective March 16, 1949.]

Paragraph 1 of the Cuban agreement, above set forth, provides that the Cuban Treaty of 1902 and the Cuban Trade Agreements of 1934, 1939, and 1941 shall be inoperative so long as both countries are contracting parties to the General Agreement on Tariffs and Trade. Paragraph 2 (a) provides that so long as both countries are parties to the said General Agreement "the provisions of Part II of Schedule XX of the General Agreement shall apply exclusively to products of the Republic of Cuba." Part II of said Schedule XX includes a preferential rate of regular duty assessable on imports of Cuban sugar under paragraph 501 of the Tariff Act of 1930. Said schedule does not provide any preferential rate on imports of Cuban sugar under the Internal Revenue Code. However, it does give preferential rates for certain other Cuban products, i. e., fish oil and lumber, which are provided for in sections 2491 (a) and 3424 of the Internal Revenue Code.

Paragraph 2 (d) of the agreement provides that imports from Cuba as to which no special customs treatment is provided in the agreement, shall be dutiable at the "most-favored-nation" rate. That term is defined in paragraph 3 as "the maximum rate which may be, or could have been, applied consistently with the principles set forth in Article I of the General Agreement to a product of a country which is a contracting party to that Agreement." An examination of the general agreement discloses that one of its purposes is "the elimination of discriminatory treatment in international commerce." (Par. 3 of the preamble.) It is provided in paragraph 1 of Article I that with respect to "customs duties and charges of any kind," any preferential treatment granted by one contracting party to imported products "shall be accorded immediately and unconditionally to the like product originating in or destined for the territories of all other contracting parties." Certain exceptions from this provision are found in paragraphs 2 and 3 of said Article I, among which we find "preferences in force exclusively between the United States of America and the Republic of Cuba," 2 (c), within certain limitations therein prescribed.

In Article II of the agreement (paragraph 1 (c)) it is provided that the products described in Part II of the schedule relating to any contracting party, which are entitled under Article I to preferential treatment, shall be exempt from ordinary customs duties in excess of those prescribed therein, and shall be "exempt from all other duties or charges of any kind imposed on or in connection with importation in excess of those imposed on the date of this Agreement or those directly and mandatorily required to be imposed thereafter by legislation in force in the importing territory on that date."

Inasmuch as Cuban sugar was subject to the rates provided in section 3500, *supra*, prior to and on the effective date of the aforesaid general agreement, such rates continued thereafter to be applicable thereto under the language quoted above. That this result was intended by the high contracting parties is clear from the language of paragraph 2 (a) of said Article II, which reads:

2. Nothing in this Article shall prevent any contracting party from imposing at any time on the importation of any product

    (a) a charge equivalent to an internal tax imposed consistently with the provisions of paragraph 1 of Article III in respect of the like domestic product or in respect of an article from which the imported product has been manufactured or produced in whole or in part.

Also, we find in Article III, paragraph 1, of Part II of the general agreement the following:

1. The products of the territory of any contracting party imported into the territory of any other contracting party shall be exempt from internal taxes and other internal charges of any kind in excess of those applied directly or indirectly to like products of national origin.

By the General Agreement on Tariffs and Trade and the Exclusive Cuban Trade Agreement, concluded concurrently therewith, extensive modifications were made in the preferential treatment accorded to products of Cuba when imported into the United States. That policy, in effect, was ratified by Congress when it extended the Trade Agreements Act, *supra*, with amendments. (Public Law 307, 63 Stat., pt. 1, ch. 585.) This is evidenced by the language of the new provision as follows:

Nothing in this Act shall be construed to preclude the application to any product of Cuba (including products preferentially free of duty) of a rate of duty not higher than the rate applicable to the like products of other foreign countries (except the Philippines), whether or not the application of such rate involves any preferential customs treatment. \* \* \*. [Sec. 6.]

Under the terms of the general agreement and the Exclusive Cuban Trade Agreement, *supra*, the determination of whether additional internal taxes are assessable upon Cuban products depends on whether

such taxes are equally applicable to like domestic articles. Section 3490 of the Internal Revenue Code, *supra*, as stated above, levied the same rates of tax as those imposed under section 3500 of that act, and was still in force in February and November 1949, when the sugar involved in protests 157569–K and 161897–K was imported. Therefore, the taxes involved in those protests were properly assessed with no preferential reduction.

For the reasons above set forth, plaintiff's claims are overruled. Judgment will be rendered in favor of the defendant.